# Exhibit 1

1   **ROTHNER, SEGALL & GREENSTONE**
    GLENN ROTHNER (*pro hac vice*)
2   JONATHAN COHEN (10551)
    ELI NADURIS-WEISSMAN (*pro hac vice*)
3   CARLOS COYE (*pro hac vice*)
    510 South Marengo Avenue
4   Pasadena, California  91101-3115
    Telephone:  (626) 796-7555
5   Fax:        (626) 577-0124
    E-mail:  grothner@rsglabor.com; jcohen@rsglabor.com
6            enaduris-weissman@rsglabor.com; ccoye@rsglabor.com

7   **CHRISTENSEN JAMES & MARTIN**
    EVAN L. JAMES (7760)
8   DARYL E. MARTIN (6735)
    7440 West Sahara Avenue
9   Las Vegas, Nevada  89117
    Telephone:  (702) 255-1718
10   Fax:        (702) 255-0871
     Email:  elj@cjmlv.com; dem@cjmlv.com

11

     Attorneys for Service Employees International Union

12

13               UNITED STATES DISTRICT COURT

14                 DISTRICT OF NEVADA

15

| | |
|---|---|
| JAVIER CABRERA, an individual; DEBORAH MILLER, an individual, CHERIE MANCINI, an individual, NEVADA SERVICE EMPLOYEES UNION STAFF UNION ("NSEUSU"), an unincorporated association, <br><br> Plaintiffs, <br><br> vs. <br><br> SERVICE EMPLOYEES INTERNATIONAL UNION. a nonprofit cooperative corporation; LUISA BLUE, in her official capacity as Trustee of Local 1107; MARTIN MANTECA, in his official capacity as Deputy Trustee of Local 1107; MARY K. HENRY, in her official capacity as Union President; CLARK COUNTY PUBLIC EMPLOYEES ASSOCIATION dba NEVADA SERVICE EMPLOYEES UNION aka SEIU 1107, a non-profit cooperative corporation; DOES 1-20; and  ROE CORPORATIONS 1-20, inclusive, <br><br> Defendants. | Case No.: 2:18-CV-00304-RFB-DJA <br><br> **DEFENDANT SERVICE EMPLOYEES INTERNATIONAL UNION'S MOTION FOR SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

Page

Notice of Motion .................................................................................................................. 1

Memorandum of Points and Authorities ............................................................................ 1

I.      Introduction ............................................................................................................. 1

II.     Statement of Undisputed Facts ............................................................................... 2

        A.      The Parties ..................................................................................................... 2

        B.      SEIU Appoints Trustees to Take Charge of Local 1107's Affairs ................ 3

                1.      SEIU's Trusteeship Authority and Practice ....................................... 4

                2.      As Trustees over Local 1107, Blue and Manteca were in charge of
                        running its operations and had sole control over its labor relations .......... 5

                3.      The Trustees, not SEIU, made all decisions regarding employment
                        and employee discipline related to Plaintiffs ....................................... 5

        C.      Claims and Allegations at Issue in This Motion ........................................... 7

                1.      Miller's Disability-Related Claims ..................................................... 7

                        (a)     Doctors' notes and interactive process ..................................... 7

                        (b)     Miller's brief return to work on October 30 .............................. 9

                2.      Miller's Fifth Claim under Section 301 and Related Grievances ........... 10

                3.      Cabrera's Seventh Claim under Section 301 and Related Grievance ...... 12

                        (a)     Termination and filing of grievance ...................................... 12

                        (b)     Grievance steps ...................................................................... 12

                        (c)     NLRB award ........................................................................... 14

                4.      NSEUSU's Eighth Claim under Section 301 and Related
                        Grievances ......................................................................................... 15

III.    Argument ............................................................................................................... 16

        A.      Summary Judgment Standard ..................................................................... 16

        B.      Because SEIU Is Not an "Alter Ego" of Local 1107, It is Not Liable for Any
                of Plaintiffs' Claims .................................................................................... 17

                1.      The ADA, Nevada law, and Section 301 apply the same "alter ego"
                        and "single employer" tests to determine liability of allegedly
                        related entities .................................................................................... 18

i

**TABLE OF CONTENTS**
(continued)

Page

    2.     SEIU and Local 1107 are not "single employers" ................................... 19

C.     First, Second, Third, Tenth, and Eleventh Claims: There is No Evidence Miller was Discriminated Against, Retaliated Against, Harassed, or Denied a Reasonable Accommodation on Account of Her Disability ............................ 21

    1.     Because there was no adverse action, Miller's harassment and retaliation claims fail ............................................................ 22

    2.     Local 1107 granted Miller a reasonable accommodation, and properly rejected the unreasonable accommodations she preferred ...................... 22

    3.     Miller was not a qualified individual with a disability ............................ 26

D.     Fifth Claim: Miller's Claims Regarding Her Request for an Accommodation Do Not Violate the CBA, and Plaintiffs Failed to Exhaust Their Claims .......... 27

    1.     Miller cannot sustain a Section 301 lawsuit over grievances related to accommodation requests because the CBA excludes such claims ......... 27

    2.     Miller may not pursue claims for breach of the CBA that were not part of the grievance filed by NSEUSU ................................................... 30

    3.     Plaintiffs failed to advance Miller's grievance to arbitration ................. 32

E.     The Seventh Claim: Because the NLRB Has Already Ordered Reinstatement and a Make-Whole Remedy, Cabrera's Claim Is Moot ...................................... 33

F.     The Seventh Claim: Even if the Claim Were Not Moot, Cabrera's Failure to Exhaust His Contractual Remedies Bars Further Relief ...................................... 35

G.     The Eighth Claim: NSEUSU's Grievance Claims Are Moot ............................. 36

IV.     Conclusion ....................................................................................................... 38

# **TABLE OF AUTHORITIES**

Page

**Cases**

*A. Dariano & Sons, Inc. v. Dist. Council of Painters No. 33*,
    869 F.2d 514 (9th Cir. 1989) ........................................................21

*Aguinaga v. United Food & Commercial Workers Int'l Union*,
    58 F.3d 513 (10th Cir. 1995) .......................................................33

*Alexander v. Gardner-Denver Co.*,
    415 U.S. 36 (1974)......................................................................28

*Alford v. Gen. Motors Corp.*,
    926 F.2d 528 (6th Cir. 1991) .......................................................27

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)..............................................................16, 17

*Atkinson v. Sinclair Refining Co.*,
    370 U.S. 238 (1962)....................................................................17

*Bastani v. Am. Fed'n of Gov't Employees, AFL-CIO*,
    No. 1:18-CV-00063 (TNM), 2019 WL 5727961 (D.D.C. Nov. 5, 2019)........................35

*Bates v. United Parcel Serv., Inc.*,
    511 F.3d 974 (9th Cir. 2007) .......................................................27

*Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*,
    289 F.3d 373 (5th Cir. 2002) .......................................................30

*Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*,
    544 F.2d 1207 (3d Cir. 1976)......................................................30

*Bowen v. United States Postal Serv.*,
    459 U.S. 212 (1983)....................................................................33

*Burnick v. Office and Professional Employees International Union*,
    Case No. 14-C-1173, 2015 WL 1898310 (E.D. Wis. April 27, 2015) ............17

*Campbell v. Int'l Bhd. of Teamsters*,
    69 F. Supp. 2d 380 (E.D.N.Y. 1999) ..........................................20

*Carstarphen v. Kimberly-Clark Corp.*,
    No. CV 14-00162-CB-C, 2015 WL 5595764 (S.D. Ala. Sept. 21, 2015) ........28

*Castaneda v. Dura-Vent Corp.*,
    648 F.2d 612 (9th Cir. 1981) .......................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................16

*Childs v. Local 18, Int'l Bhd. of Elec. Workers*,
    719 F.2d 1379 (9th Cir. 1983) ................................................18, 21

iii

## TABLE OF AUTHORITIES
(continued)

Page

*Church of Scientology of California v. United States*,
    506 U.S. 9 (1992) ................................................................................................34

*Cole v. Gen. Motors Corp.*,
    641 F. Supp. 28 (W.D. Mich. 1984) ...................................................................31

*Dark v. Curry Cty.*,
    451 F.3d 1078 (9th Cir. 2006) ...............................................................25, 26, 27

*Denning v. Washoe Cty.*,
    No. 3:17-cv-00463-MMD-WGC, 2018 WL 4286185 (D. Nev. Sept. 7, 2018),
    *aff'd*, 799 F. App'x 547 (9th Cir. 2020)..............................................................22

*Desert Palace, Inc. v. Local Joint Exec. Bd. of Las Vegas*,
    679 F.2d 789 (9th Cir. 1982) ...............................................................................34

*Dillard v. United Food & Commercial Workers Union Local 1657*,
    Case No. CV 11-J-0400-S, 2012 WL 12951189 (N.D. Ala. Feb. 9, 2012),
    *aff'd*, 487 F. App'x 508 (11th Cir. 2012)......................................................20, 21

*Fields v. Teamsters Local Union No. 988*,
    23 S.W.3d 517 (Tx. Ct. App. 2000)....................................................................20

*Fox v. Sysco Corp.*,
    No. 2:11-CV-00424-RLH, 2011 WL 5838179 (D. Nev. Nov. 21, 2011)...........19

*Garcia v. Serv. Employees Int'l Union*,
    No. 2:17-CV-01340-APG-NJK, 2019 WL 4279024 (D. Nev. Sept. 10, 2019),
    appeal pending, No. 19-16934 ........................................................................3, 21

*Griffin v. United Parcel Serv., Inc.*,
    661 F.3d 216 (5th Cir. 2011) ...............................................................................26

*Grow v. Garcia*,
    No. 0307-CV-00105-LRH-RAM, 2010 WL 455118 (D. Nev. Feb. 3, 2010) ...................13

*Herman v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 971*,
    60 F.3d 1375 (9th Cir. 1995) ...................................................................18, 19, 20

*Hill v. Walker*,
    737 F3d 1209 (8th Cir. 2013) ..............................................................................26

*J.M. Tanaka Constr. Inc. v. NLRB*,
    675 F.2d 1029 (9th Cir. 1982) .............................................................................19

*Keister v. PPL Corp.*,
    677 F. App'x 63 (3d Cir. 2017) ...........................................................................31

*Larkins v. CIBA Vision Corp.*,
    858 F. Supp. 1572 (N.D. Ga. 1994)....................................................................25

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ..........................................................................14

*Local 2750, Lumber & Sawmill Workers Union, AFL-CIO v. Cole*,
    663 F.2d 983 (9th Cir. 1981) ..........................................................................33

*Loss v. Blankenship*,
    673 F.2d 942 (7th Cir.1982) ...........................................................................17

*Loulseged v. Akzo Nobel Inc.*,
    178 F.3d 731 (5th Cir. 1999) ..........................................................................25

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .........................................................................................17

*McAlindin v. Cty. of San Diego*,
    192 F.3d 1226 (9th Cir. 1999) ........................................................................24

*Moore v. Sunbeam Corp.*,
    459 F.2d 811 (7th Cir. 1972) ..........................................................................30

*Orr v. Bank of Am., NT & SA*,
    285 F.3d 764 (9th Cir. 2002) ..........................................................................13

*Pardi v. Kaiser Found. Hospitals*,
    389 F.3d 840 (9th Cir. 2004) ..........................................................................22

*Perez v. Int'l Bhd. of Teamsters, AFL-CIO*,
    Case No. 00-civ-1983-LAP-JCF, 2002 WL 31027580 (S.D.N.Y. Sep. 11, 2002)...........20

*Phelps Dodge Corp. v. NLRB*,
    313 U.S. 177 (1941)..........................................................................................34

*Pond v. Michelin N. Am., Inc.*,
    183 F.3d 592 (7th Cir. 1999) ..........................................................................25

*Ramsey v. Signal Delivery Serv., Inc.*,
    631 F.2d 1210 (5th Cir. 1980) ........................................................................17

*Rehrs v. Iams Co.*,
    486 F.3d 353 (8th Cir. 2007) ..........................................................................26

*Republic Steel Corp. v. Maddox*,
    379 U.S. 650 (1965)..........................................................................30, 31, 36

*Ritzer v. Gerovicap Pharm. Corp.*,
    162 F.R.D. 642 (D. Nev. 1995).......................................................................18

*Rubino v. ACME Bldg. Maint.*,
    No. C 08-00696 JW, 2008 WL 5245219 (N.D. Cal. Dec. 15, 2008)................18

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *Samper v. Providence St. Vincent Med. Ctr.*,
       675 F.3d 1233 (9th Cir. 2012) ...............................................................23, 26

4

*San Diego Building Trades Council v. Garmon*,
5       359 U.S. 236 (1959)............................................................................36

6   *Schulman v. Wynn Las Vegas, LLC*,
       No. 212-cv-01494-RCJ-GWF, 2016 WL 199416 (D. Nev. Jan. 15, 2016) ................23, 24

7

*Spencer v. Kemna*,
8       523 U.S. 1 (1998)...........................................................................35, 38

9   *Spokeo, Inc. v. Robins*,
       136 S. Ct. 1540 (2016)...........................................................................34

10

*Stupy v. U.S. Postal Serv.*,
11       951 F.2d 1079 (9th Cir. 1991) .........................................................30, 33, 36

12   *Swallows v. Barnes & Noble Book Store, Inc.*,
       128 F.3d 990 (6th Cir. 1997) .......................................................................18

13

*T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*,
14       806 F.3d 451 (9th Cir. 2015) .......................................................................18

15   *U.S. E.E.O.C. v. UPS Supply Chain Sols.*,
       620 F.3d 1103 (9th Cir. 2010) ..................................................................23, 24

16

*UA Local 343 of the United Ass'n of Journeymen & Apprentices v. Nor-Cal Plumbing, Inc.*,
17       48 F.3d 1465 (9th Cir. 1994) ...............................................................18, 19, 21

18   *Vaca v. Sipes*,
       386 U.S. 171 (1967)............................................................................27, 30, 31

19

*Van Norman v. Harman Mgmt. Corp.*,
20       No. C93-2880 MHP, 1995 WL 803508 (N.D. Cal. July 6, 1995) ....................................19

21   *Watson v. Gulf & W. Indus.*,
       650 F.2d 990 (9th Cir. 1981) .......................................................................19

22

*White v. York Int'l Corp.*,
23       45 F.3d 357 (10th Cir. 1995) .......................................................................25

24   *Winston v. Gen. Drivers, Warehousemen & Helpers, Local Union No. 89*,
       93 F.3d 251 (6th Cir. 1996) .......................................................................31

25

*Zivkovic v. S. California Edison Co.*,
26       302 F.3d 1080 (9th Cir. 2002) .......................................................................23

27

28

## **TABLE OF AUTHORITIES**
(continued)

Page

**Arbitration Decisions**

*BWXT Pantex, LLC,*
    120 Lab. Arb. 385 (Jennings, 2004) ................................................................28

*International Harvester Co.,*
    15 Lab. Arb. 1 (Seward, 1950) ......................................................................34


**Statutes and Regulations**

Labor Management Relations Act, Section 301, 29 U.S.C. § 185 ................................1

29 U.S.C. § 158(a)(5) ...........................................................................................36

42 U.S.C. § 12111(8) ...........................................................................................26

42 U.S.C. § 12112(b)(5)(A) .............................................................................24, 25

29 C.F.R. Part 1630, App., 56 Fed. Reg. 35,726–01, 35,749 (July 26, 1991) ...............23


**Rules**

Federal Rules Civil Procedure
    Rule 56(c).................................................................................................16

Federal Rules of Evidence
    Rule 201(b) ..............................................................................................14


**Miscellaneous**

Elkouri & Elkouri, *How Arbitration Works* (8th ed. 2016) ......................................34

Marvin Hill, Jr. & Anthony V. Sinicropi, *Remedies in Arbitration* (2d ed. 1991) ........30

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**YOU ARE HEREBY NOTIFIED** that Defendant Service Employees International Union ("SEIU") hereby moves for summary judgment on all remaining claims asserted in the First Amended Complaint (the First, Second, Third, Fifth, Seventh, Eighth, Tenth, and Eleventh claims), or in the alternative, summary adjudication of claims, in favor of SEIU and against all Plaintiffs.  This motion is based on the following memorandum of points and authorities, the Declarations of Deirdre Fitzpatrick, Luisa Blue, and Eli Naduris-Weissman filed herewith, the pleadings and papers filed in this action, and upon such other matters that may be presented to the Court in connection with this motion.

DATED:  July 22, 2020
                                   ROTHNER, SEGALL & GREENSTONE
                                   GLENN ROTHNER (*pro hac vice*)
                                   JONATHAN COHEN
                                   ELI NADURIS-WEISSMAN (*pro hac vice*)
                                   CARLOS COYE (*pro hac vice*)

                                   By       */s/Eli Naduris-Weissman*
                                      ELI NADURIS-WEISSMAN
                                   510 South Marengo Avenue,
                                   Pasadena, CA  91101-3115
                                   Tel: (626) 796-7555 Fax: (626) 577-0124
                                   *Attorneys for SEIU*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     Introduction**

      Plaintiffs' lawsuit concerns two sets of claims: (1) five claims by Plaintiff Debbie Miller alleging that Defendants Service Employees International Union ("SEIU") and SEIU Local 1107 ("Local 1107") discriminated against, retaliated against, and harassed her based on a disability, allegedly in violation of the Americans with Disabilities Act ("ADA") [First, Second, and Third claims] and Nevada law [Tenth and Eleventh claims]; and (2) three claims, one on behalf of each of the plaintiffs, brought under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (hereafter "Section 301") alleging violations of the collective bargaining agreement ("CBA") between Local 1107 and the staff union that represents Local 1107 employees, Plaintiff Nevada Service Employees Union Staff Union ("NSEUSU") [Fifth, Seventh, and Eighth claims].

      SEIU seeks summary judgment on all claims because it did not employ any of the

Plaintiffs. Plaintiffs Miller and Javier Cabrera were employed by Local 1107, not SEIU, and SEIU was not a party to the CBA with NSEUSU, nor involved in the employment actions underlying Plaintiffs' claims. Because SEIU was neither the alter ego of, nor a "single employer" with Local 1107, it cannot be liable for any claims under the ADA, Nevada law, or Section 301.

In the alternative, summary judgment should be granted in SEIU's favor because Plaintiffs cannot establish a genuine issue of material fact in support of their claims on the merits.  As to Miller, the undisputed evidence shows that Local 1107 granted her a reasonable accommodation for her diabetes—flexibility to take breaks to manage her diabetes by eating or taking medication as needed—but she was unwilling to try the accommodation. Instead, she insisted on unreasonable accommodations—reassignment to a front-desk position that was already occupied, and a "set schedule" despite the fact that varied hours were an essential function of her job as a union organizer.  As to the Section 301 claims, they are either unavailable or moot.  Miller cannot litigate her ADA claim through the CBA's grievance procedure, because the CBA excludes such claims by its clear terms.  Plaintiff Cabrera's "just cause" grievance is moot, because he filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"), and was awarded reinstatement and full make-whole relief, which Local 1107 has honored.  Moreover, undisputed evidence also shows both Miller and Cabrera failed to exhaust available contractual remedies because despite Local 1107's willingness, they did not proceed to the CBA's arbitration step before bringing their lawsuit.

For these and the reasons that follow, SEIU is entitled to summary judgment on all of Plaintiffs' remaining claims.

## II.  Statement of Undisputed Facts

### A.  The Parties

Defendant SEIU is an international labor union representing about 2 million public and private sector employees. Declaration of Deirdre Fitzpatrick ("Fitzpatrick Decl."), ¶ 2. SEIU is governed by its Constitution and Bylaws, and its headquarters are in Washington, D.C.  *Id*., ¶ 3

Defendant Local 1107 is a labor union representing over 17,000 public and private sector employees in Nevada, and is affiliated with SEIU. Fitzpatrick Decl. ¶ 4.  Currently, Local 1107

is led by an elected President, Executive Board, and other officers. *Id.*, ¶ 12. In 2017, Local 1107 was placed under a trusteeship by SEIU, and the local's daily operations were run by Trustees who acted on behalf of the local.  *Id.*, ¶ 11; Declaration of Luisa Blue ("Blue Decl."), ¶ 3.

Plaintiff Deborah Miller was an organizer employed by Local 1107 from 2009, ECF No. 26, First Amended Complaint ("FAC"), ¶ 26, until her separation from Local 1107 in January 2018. *See* Declaration of Eli Naduris-Weissman ("ENW Decl."), Ex. A (Deposition of Debbie Miller) [hereafter "Miller Depo"], Tr. 137:20–21. Miller alleges she was discriminated against, retaliated against, and harassed based on her diabetes, in violation of the ADA [FAC, ¶¶ 24-81] and Nevada law [*id.*, ¶¶ 191-215]. She also alleges, under Section 301, that she was not granted a reasonable accommodation in violation of Article 1 and Article 2 of the CBA, as stated in the grievance NSEUSU filed on her behalf.  FAC, ¶ 100; ENW Decl., Ex. D (Deposition of NSEUSU's Rule 30(b)(6) Representative) ["NSEUSU Depo"], Ex. B; Miller Depo, Ex. 3.

Plaintiff Javier Cabrera was also an organizer for Local 1107, a position he held for over 15 years.  FAC, ¶ 134.  Local 1107 terminated him on October 30, 2017.  NSEUSU thereafter filed a grievance on his behalf, alleging that his termination violated Article 7 of the CBA, which requires that discipline be supported by just cause. FAC, ¶ 160; NSEUSU Depo, Ex. E.

Plaintiff NSEUSU is a labor union that represents the non-managerial staff of Local 1107, including former employees Miller and Cabrera.  At all times relevant to this litigation, NSEUSU had a CBA with Local 1107 governing the terms and conditions of represented employees' working conditions at Local 1107.  Blue Decl. ¶ 4. At issue in this lawsuit, NSEUSU alleges that Local 1107 violated the CBA in several respects.  FAC, ¶ 176–180.

**B.    SEIU Appoints Trustees to Take Charge of Local 1107's Affairs**

On April 28, 2017, after Local 1107's Executive Board voted in favor of a voluntary trusteeship, SEIU President Mary Kay Henry placed Local 1107 under an emergency trusteeship based on her authority under the SEIU Constitution and affiliation agreement with Local 1107.[1]

---

[1]  Judge Andrew P. Gordon granted summary judgment to SEIU in a consolidated action alleging that it imposed the trusteeship unlawfully.  *See Garcia v. Serv. Employees Int'l Union*, No. 2:17-CV-01340-APG-NJK, 2019 WL 4279024 (D. Nev. Sept. 10, 2019), appeal pending, No. 19-16934 (docketed Oct. 2, 2019).  Judge Gordon explained the sequence of events as follows:

Fitzpatrick Decl. ¶ 10 & Ex. B. At that time, Henry appointed Luisa Blue as Trustee and Martin Manteca as Deputy Trustee over Local 1107, removed all Local 1107 officers and Executive Board members, and suspended the Local 1107 Constitution and Bylaws.  *Id.*

> 1.     <u>SEIU's Trusteeship Authority and Practice</u>

Article VIII, § 7(a) of SEIU's Constitution authorizes SEIU's President to appoint a trustee "to take charge and control of the affairs" of an affiliated union "for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of this International Union . . . ." Fitzpatrick Decl. ¶ 3 & Ex. A at 19. The appointment of such trustee "shall have the effect of removing the officers of the Local Union or affiliated body." *Id.*

Article VIII, § 7(b), which explains the Trustee's powers, provides:

> The Trustee shall be authorized and empowered to take full charge of the affairs of the Local Union or affiliated body and its related benefit funds, to remove any of its employees, agents and/or trustees of any funds selected by the Local Union or affiliated body and appoint such agents, employees or fund trustees during his or her trusteeship, and to take such other action as in his or her judgment is necessary for the preservation of the Local Union or affiliated body and for the protection of the interests of the membership.  The Trustee shall report on the affairs/transactions of the Local Union or affiliated body to the International President. The Trustee and all of the acts of the Trustee shall be subject to the supervision and direction of the International President.

*Id.*

Consistent with SEIU's Constitution, when SEIU appoints a trustee over a local union, the trustee "take[s] full charge of the affairs of the Local Union," including the removal and appointment of employees in the trustee's discretion.  Fitzpatrick Decl. ¶ 7 Indeed, the trustee or trustees, as the case may be, take over all day-to-day administration of the local, and are in charge of the labor relations of the trusteed local.  *Id.*

In contrast to the trustees, SEIU's role in a trusteed local is limited.  SEIU assists with the initial imposition of the trusteeship, pays for the costs the local must incur related to the trusteeship such as trustee salaries, and assists in the process of taking the local out of trusteeship

---

"Consistent with the affiliation agreement, the Local executive board voted to approve a trusteeship. And consistent with the SEIU constitution, Henry thereafter imposed an emergency trusteeship with a post-trusteeship hearing." *Id.* at *12.

and returning to self-governance. Fitzpatrick Decl. ¶ 8. However, SEIU's leadership and human resources department do not administer or control staffing decisions over local unions, whether in trusteeship or not. *Id.*, ¶ 13. From an operational and management perspective, the trustee is in control and assumes all duties of the local union officers he or she replaces. *Id.*, ¶ 8. In doing so, the trustee "stands in the shoes" of the former local union officers, taking such actions "as in his or her judgment is necessary for the preservation of the Local Union or affiliated body and for the protection of the interests of the membership." *Id.*, ¶¶ 7, 11 & Ex. A at 19.

### 2. As Trustees over Local 1107, Blue and Manteca were in charge of running its operations and had sole control over its labor relations.

In the trusteeship order, President Henry endowed the two trustees with "all of the powers that they are entitled to assume under the SEIU Constitution and Bylaws and applicable law, for the purposes of preventing disruption of contracts, assuring that the Local Union performs its duties as collective bargaining representative, restoring democratic procedures, protecting the interests of Local 1107 and its membership, and otherwise carrying out the legitimate objects of the International Union." Fitzpatrick Decl., Ex. B.

Upon their appointment on April 28, 2017, Blue and Manteca took over the duties of Local 1107's former officers and were responsible for the union's day-to-day affairs. Blue Decl. ¶¶ 2–3; ENW Decl., Ex. F at 8–9 (Response to Interrogatory No. 17). To achieve their mandate of addressing the problems at Local 1107 and building a stronger union, the Trustees introduced new programs at Local 1107, such as the Together We Rise campaign, and new approaches to managing the union's staff. Blue Decl. ¶ 3. In consultation with Blue and with her authorization, Manteca oversaw the day-to-day business of the local and supervised its staff. *Id.* All major decisions, however, including those related to labor relations, required Blue's approval. *Id.*

During this time, SEIU was not responsible for the day-to-day operations of Local 1107, and was not responsible for hiring, training, supervising, disciplining, or other employment matters concerning Local 1107 employees. Fitzpatrick Decl. ¶ 13. SEIU was also not responsible for dealing with any collective bargaining disputes or grievances with NSEUSU. *Id.*

### 3. The Trustees, not SEIU, made all decisions regarding employment and employee discipline related to Plaintiffs.

In their roles as Trustee and Deputy Trustee, Blue and Manteca made all decisions related

to the claims at issue in this lawsuit: Miller's request for a reasonable accommodation and related grievance, the grievance over Cabrera's termination, and the handling of grievances and other labor relations matters with NSEUSU.[2]  Blue Decl. ¶¶ 4–7.  Neither SEIU's leadership nor its human resources department were involved in these decisions.  Fitzpatrick Decl. ¶ 14.

All issues related to Miller's request for a reasonable accommodation were handled by the Trustees and those working under them, not SEIU. For example, Miller informed Manteca and Blue of her diabetes in September 2017, as well as Grace Vergara and Helen Sanders, the organizing staff who acted under Martin's direction. *See* ENW Decl. ¶ 7 & Ex. F at 2 (Miller's Response to Interrogatory No. 3, part b.); Miller Depo, Tr. at 12–13; Blue Decl. ¶¶ 3. Miller also submitted doctors' notes to Manteca, Miller Depo, Tr. 115:14-21; 126:13–17 & Exs. 4, 5 & 8, and her reasonable accommodation request to Blue and Manteca. *Id.* at 241:18–22.  She did not submit this request to SEIU President Henry, who had nothing to do with personnel matters involving Miller. *Id.* at 241:23 – 242:3. Miller met with Manteca on or about October 17, 2017 to discuss the doctors' notes she submitted. *Id.* at 116:18 – 117:9. Manteca then sent Miller a letter summarizing the meeting, *id.* at 123:1-19 & Ex. 7, and on October 26, 2017 sent Miller a letter with findings and conclusions regarding her request and granting certain accommodations. *Id.* at 131:5-14 & Ex. 9. Manteca then allowed her to take further medical leave due to her condition. *Id.* at 140:15 – 141:3. SEIU was not involved in any of these actions.  Fitzpatrick Decl. ¶ 14.

Similarly, Blue and Manteca were responsible for Cabrera's discipline.  Blue Decl. ¶¶ 4, 6.  Cabrera's Notice of Termination was issued by Manteca, over Manteca's signature.  *Id.*, ¶ 6; ENW Decl., Ex. B (Deposition of Javier Cabrera) ["Cabrera Depo"], Tr. 120:18 – 121:15 & Ex. I. SEIU was not involved. Fitzpatrick Decl. ¶ 14. Indeed, Cabrera testified that he understood that Manteca fired him, not any other individual or entity. Cabrera Depo, Tr. 121:16–18.

Finally, all of the staff union's claims concerning the handling of grievances filed during the trusteeship, FAC at 32-33, were handled by the Trustees, not SEIU.  First, the grievances are based on the CBA between NSEUSU and Local 1107.  *See* Blue Decl., Ex. B.  This CBA was

---

[2]  Although new trustees were named after Manteca and Blue left their appointments in June 2018 and October 2018 respectively, Blue Decl. ¶ 1, Manteca and Blue were the trustees at all times relevant to the claims at issue in this motion.

negotiated between NSEUSU and Local 1107 prior to the trusteeship, without involvement by SEIU.  NSEUSU Depo, Tr. 141:16 – 142:18.  Article 11 of the CBA specifies that a grievance is defined "as a filed dispute between the Union [NSEUSU], on behalf of an employee(s), *and the Employer [Local 1107]* over the interpretation and or application of the express terms of this agreement or a dispute over the issuance of discipline as defined herein."  Blue Decl., Ex. B. at 15.[3]  Consistent with this agreement, NSEUSU's 30(b)(6) representative testified that all of the grievances at issue in this lawsuit were filed against Local 1107, not any other party.  NSEUSU Depo, Tr. 144:6–23.  *See also* Cabrera Depo, Tr. 45:6–8 ("Did you file any grievances with Martin Manteca? A. Yes.").  Finally, all of the meetings held to discuss these grievances were between NSEUSU representatives, the affected employee, and the Trustees; SEIU was not a party to these meetings.  *See* Blue Decl. ¶¶ 4–7; Fitzpatrick Decl. ¶ 14.

### C.      Claims and Allegations at Issue in This Motion

#### 1.      Miller's Disability-Related Claims

The First, Second, and Third Claims each allege that Defendants violated the ADA in different ways—discrimination, retaliation, and harassment—all based on a common nucleus of facts: that after Miller presented doctors' notes regarding her diabetes to the Trustees, they failed to participate in the interactive process in good faith, refused to provide Miller's requested accommodation of a transfer to the front desk position or fixed schedule, demoted her from lead organizer to organizer after she requested accommodations, and changed her organizing territory from the designated bargaining units she had served for 10 years to Clark County, a turf she alleges would have required more time on her feet.  *See* FAC, ¶¶ 49–54; 63–68; 76–77.  The Tenth and Eleventh Claims seek relief on the same allegations under Nevada law, based on the discrimination and retaliation (but not harassment) theories.  *Id.*, ¶¶ 195–99; 206–11.

(a)      Doctors' notes and interactive process

The undisputed evidence shows that in mid-September, 2017, Miller began to have issues associated with her diabetes and collapsed while working.  Miller Depo, Tr. 136:4-7.  Sometime

---

[3] Article 1.A of the CBA makes clear that all references in the agreement to "Employer" refer to Local 1107.  *See* Blue Decl., Ex. B at 3 ("Service Employees International Union, Local 1107 (hereinafter referred to as the Employer) . . . .").

prior to October 17, 2017, Miller presented two doctor's notes to Manteca.  Miller Depo, Ex. 4 & 5.  The October 9, 2017 note from Dr. Raji Venkat stated that "Debbie's blood sugars can get out of control when shes [sic] not able to eat on time" and recommended she have "a set schedule for work and breaks, so she's able to eat on time, exercise and take care of her health."  *Id.*, Ex. 4.  The October 11, 2017 note from Dr. Nick Liu stated that she had "0%" temporary degree of disability, "may return to work 10/17/17," and recommended a desk job.  *Id.*, Ex. 5.

When Miller returned on October 17, 2017, she met with Manteca to discuss the doctors' notes, and at the conclusion of the meeting Miller remained on leave (using her paid time off) pending further information from her doctor.  Miller Depo, Tr. 119:10-24.  On October 19, 2017, Manteca sent Miller a letter summarizing the meeting, seeking further information to allow Local 1107 to evaluate her requested accommodation, and told her: "[y]ou may also continue to use PTO while you obtain additional information from your medical providers."  *Id.*, Ex. 7.  On October 23, 2017, Miller emailed an additional note from Dr. Liu stating "Patient may not exceed 50% sitting and 50% standing during her shift until 1/23/18" and, like the previous note, said she had "0%" temporary degree of disability.  *Id.* at 126:10–15; 127:13 – 128:18.

On October 26, 2017, Manteca sent Miller a three-page letter responding to the doctors' notes and her requests, and granting the following accommodations:

> As an organizer, you are already allowed a fair degree of scheduling latitude to see to it that your duties are timely fulfilled.  As a professional, we trust that you can exercise your discretion to decide when you need to sit and stand. To the extent you seek that reasonable accommodation, it is granted, effective immediately through January 23, 2018, consistent with Dr. Liu's note.  Likewise, you are granted a reasonable accommodation to take reasonable breaks during your shift to manage your blood glucose levels, including time to test your blood glucose levels, to take meal breaks and breaks needed to take any necessary medication to treat your diabetes. You may also eat during your shift to the extent necessary to manage your diabetes. These meal and break accommodation are effective immediately.

Miller Depo, Ex. 9, pp. 1-2.  On October 29, 2017, NSEUSU filed a grievance related to Miller's accommodation request, seeking as a remedy that Miller "receive the reasonable accommodation of being placed in the front desk position."  *See* NSEUSU Depo, Ex. B; Miller Depo, Tr. 72:9–25 & Ex. 3. In further e-mail communications, on October 31, 2017 Manteca reiterated that the front desk is not presently available, that reassignment is not a reasonable accommodation and would

create an undue hardship for Local 1107, and again explained the accommodation granted:

> [W]e still conclude that the accommodations that we have granted to you—sit/stand flexibility, reasonable breaks during your shift that are necessary to test and manage your blood sugar levels, meal breaks, and eating during your shift, all at your reasonable discretion—are reasonable and will be effective accommodations for the impairments you have identified and substantiated.

*Id.*, Ex. 18 at Local-0295.

### (b) Miller's brief return to work on October 30

Rather than attempt these accommodations, Miller only returned to work for one day, and then took an extended paid leave until January 8, 2018. Miller Depo, Tr. 137:19 – 138:3. The evidence regarding her return on October 30, 2017 contradicts the complaint allegations that Miller was demoted or that her organizing turf was changed in retaliation for her accommodation request. *See* FAC, ¶¶ 44, 52, 68, 76, 77, 197, 211.

In her deposition, Miller clarified that upon returning to work on October 30, she was initially asked to drop off flyers at the Las Vegas Convention and Visitors Authority (LVCVA), and then the Regional Justice Center (RJC). Miller Depo, Tr. 57:1-8. But the assignment was "for that day, one day" only. *Id.* at 56:24–25. *See also id.* at 58:1-4 ("Q. . . But you were never told that being assigned to the county would mean that you would have to do that every day? A. Not when I went back to work on that day, no."). Rather than being reassigned, Miller admitted she "[w]as not given any kind of meeting or conversation as to where [her] turf was going to be." *Id.* at 58:19-21; 163:14-16 ("Q. And so was that going to be a permanent reassignment? A. I have no idea."). Moreover, Miller was not even required to go to the LVCVA or RJC; when she indicated that the walk from the garage parking lot to the building was too long, she instead was allowed to do phone-banking for the rest of the day. *Id.* at 62:7–13 & 63:13–23.[4]

Nor is there any evidence Miller was demoted, as claimed. In her deposition Miller clarified that whether she was demoted was only a question she *asked*; she was never told so. *See* Miller Depo, Tr. 61:25 – 62:62:2 ("Q. So at this point, you don't know if you've been demoted;

---

[4] Nor was Miller required to do different assignments the next day. Although on the 30th Miller was asked to go to the RJC the next morning, she was not made to do so after pointing out that the walk would have been too long, and, in any event, she had morning blood sugar treatments at that time. Miller Depo, Tr. 71:24 – 72:8; 69:8-13. Instead, she took further leave. *Id.* at 140-41.

correct? A. I do not know, no."); *id.* at 221:19–24 ("Q. [Y]ou were never told you are being demoted? A. No, didn't get an answer to my question because it was a question posed. Q. So you don't know if you were demoted? A. I don't know. But I did ask the question."). Neither her pay nor title changed; there is no evidence that she was demoted on October 30, 2017 or thereafter.

Instead, at that point Manteca allowed her to take paid time off as a further accommodation. Miller Depo, Tr. 140:15 – 141:6. Miller stayed on this extended leave of absence, never having attempted the accommodations offered to her on October 26 and reiterated on October 31. *Id.*, Ex. 9 & 18. Indeed, she refused to work and ultimately chose to litigate rather than return to Local 1107. *See* Miller Depo., Tr. 140:17-25, 141:1-15, 143:16-17, 144:1.

### 2. Miller's Fifth Claim under Section 301 and Related Grievances

The Fifth Claim alleges that Defendants breached the NSEUSU-Local 1107 CBA in connection with the denial of Miller's request for the front desk position. FAC at 18–21. The Claim alleges that filling the position with a temporary employee, requiring the holder of the position to speak Spanish, and not providing the position to Miller violated Articles 1, 2, 8, 22, and 24 of the CBA. FAC, ¶¶ 107–110. The Claim also alleges the Trustees violated Article 11 of the CBA by refusing to hold a Step 2 grievance meeting, and unilaterally making findings and conclusions on the grievance as filed. *Id.*, ¶ 111. Despite the broad framing of these allegations in the complaint, the grievances filed by NSEUSU on Miller's behalf were more limited. The October 29, 2017 grievance regarding accommodations named Manteca as the supervisor, and described the "Statement of Grievance" as follows:

> Debbie Miller has requested the front desk position that is presently being occupied by a temporary agency employee. This is a reasonable accommodation (under ADA) and is in no way a hardship for SEIU Local 1107. Ms Miller submitted doctors' notes stating that since she has diabetes her blood sugar can get out of control when she is not able to eat on time. The recommendation is that Ms Miller has a set schedule for work and breaks, that she is able to eat on time, and that she needs to take care of her health. Furthermore. it is recommended that Ms Miller transfer to a desk job.
>
> Ms Miller was denied this reasonable accommodation by Mr Manteca, who stated that Ms Miller did not qualify for the position because she did not speak Spanish. This criteria is non-existent in that previous employees in this position did not speak Spanish and were not required to do so.

NSEUSU Depo, Ex. B; Miller Depo, Ex. 3. The "Article violated" section states: "Art – 1(c): Recognition; Art – 2: Non-Discrimination; and any other applicable Articles and state and/or

1    federal laws." *Id.* The "Requested Remedy" is "[t]hat bargaining unit employee, Debbie Miller,

2    receive the reasonable accommodation of being placed in the front desk position and that Mr

3    Manteca adhere to the law of the Americans with Disabilities Act." *Id.*

4        As a grievance relating to the interpretation and application of the CBA, it was initiated at

5    Step 2. *See* Blue Decl., Ex. B at 15. A Step 2 meeting was scheduled to be held on December

6    15, 2017 with Blue, but the meeting was cancelled when Plaintiffs' current counsel appeared at

7    the meeting without prior announcement or confirmation that he represented either Miller or

8    NSEUSU at the time. Blue Decl. ¶ 5; *see also* Miller Depo at 180:3–19 (Miller did not know if

9    anyone notified Local 1107). Blue would not meet because she had not arranged for Local 1107

10   counsel's presence, and Mr. McAvoyamaya was counsel in litigation—later dismissed, *see supra*

11   n.1— directly against Blue concerning the SEIU trusteeship. Blue Decl. ¶ 5. After confirmation

12   that Miller was represented, Local 1107 counsel sent Miller's counsel a letter seeking to

13   reschedule the Step 2 meeting and offering January 9, 2018 as a date for the meeting. *Id.* & Ex.

14   C. However, NSEUSU refused the offer to meet and instead indicated its intent to proceed

15   directly to litigation. *Id.* & Ex. D. After considering this refusal, Local 1107 denied the

16   grievance as filed. *See id.* & Ex. E. Thereafter, in two separate communications, Miller's

17   counsel responded to the Trustees' inquiries by indicating that Miller would not be returning to

18   work, and would proceed to litigation rather than arbitration. *See id.* & Ex. F at 2, Ex. G at 3–4.

19       On November 28, 2017, NSEUSU filed a second grievance related to Miller, alleging the

20   grievance process adopted by the Trustees in her accommodation grievance violated Article 11

21   of the CBA. NSEUSU Depo, Tr. 111 & Ex. I. Article 11 states that Step 1 of the grievance

22   procedure will be a meeting with the SEIU 1107 Local President and Step 2 an appeal to the

23   Local 1107 Executive Board ("as representative of the Employer"), resulting in a meeting with a

24   three- to five-member panel. Blue Decl., Ex. B at 15–16. The November 28, 2017 grievance

25   alleged that the Trustees violated the CBA based on Manteca's statement—given that there was

26   no longer a president or executive board—he would act in the capacity of the Local 1107

27   President for the Step 1 grievance meeting, and Blue would act in the capacity of the Executive

28   Board panel for Step 2. NSEUSU Depo, Ex. I. The "Requested Remedy" section stated: "[t]hat

11

NSEUSU and SEIU Local 1107 obtain a list of all former EBoard members and through the striking process, mutually agree upon a panel of 3 to 5 members. This panel should be approximately ½ public sector and ½ private sector." *Id.*[5]

### 3.    Cabrera's Seventh Claim under Section 301 and Related Grievance

The Seventh Claim alleges that Cabrera's termination violated the CBA by the following specific breaches: (1) violation of Article 7, by failing to follow the principle of "just cause," progressive discipline steps, and writing Cabrera up for a prior violation for which he had already received a verbal warning [FAC, ¶¶ 164–66]; (2) violation of Article 11 for unilaterally cancelling the Step 1 meeting with Cabrera because he appeared with his legal representative and refusing to facilitate a Step 2 hearing before a "panel of individuals" [FAC, ¶¶ 167–68]; and (3) violation of Article 24 by "failing to provide for retention" of Cabrera.  FAC, ¶ 169.

#### (a)    Termination and filing of grievance

Local 1107 terminated Cabrera on October 30, 2017.  On that date, he was given a termination letter signed by Manteca.  Cabrera Depo, Tr. 120:17 – 121:18 & Ex. I.  The next day, NSEUSU filed a grievance alleging that Cabrera's discipline violated the CBA.  FAC, ¶ 160; NSEUSU Depo, Tr. 103:15–21 & Ex. E; Cabrera Depo, Tr. 32:7–24 & Ex. A.  The "Statement of Grievance" on the grievance form states: "Javier was terminated without just cause."  *See* NSEUSU Depo, Ex. E.  The "Article violated" section states: "Art–7: Disciplinary action, and any other applicable Articles."  *Id.*  The "Requested Remedy" section of the grievance states: "That Javier is reinstated and made whole in every way."  *Id.*[6]

#### (b)    Grievance steps

As alleged in the FAC, a Step 1 meeting was scheduled with Manteca and Local 1107 counsel.  FAC, ¶ 160.  Cabrera agreed to the Step 1 proceeding and participated in the meeting. Cabrera Depo, Tr. 50:3–5.  On January 3, 2018, Luisa Blue sent a letter to Cabrera's counsel

---

[5]  In the NSEUSU 30(b)(6) deposition, after reviewing the October 29 and November 28, 2017 grievances described above, NSEUSU's representative did not remember whether there were any other grievances related to Miller as part of this lawsuit.  NSEUSU Depo, Tr. 157:13 – 158:7.

[6]  In the NSEUSU 30(b)(6) deposition, after reviewing the October 31, 2017 grievance concerning Cabrera's termination, NSEUSU's representative did not remember whether there were any other grievances related to Cabrera's termination that are part of this lawsuit. NSEUSU Depo, Tr. 158:8 – 160:13.

scheduling the Step 2 meeting.  Blue Decl. ¶ 6 & Ex. H. A Step 2 meeting was later held with

Blue and NSEUSU counsel on January 22, 2018.  *Id.*, ¶ 6; Cabrera Depo, Tr. 47:1–23.[7]  No other

parties besides Manteca, Blue, and Local 1107 counsel appeared on Local 1107's behalf or

participated in these grievance meetings.  Blue Decl. ¶ 6. Thereafter, Blue wrote to NSEUSU

denying the grievance at Step 2 and informing NSEUSU that it had the option of making a

written request for arbitration as set forth in the CBA.  *Id.* & Ex. I.

NSEUSU failed to advance Cabrera's case to arbitration.  On March 5, 2018, Local 1107

counsel sent a letter to Cabrera's counsel informing him that NSEUSU failed to take the

necessary steps to submit the case to arbitration.  Blue Decl. ¶ 6 & Ex. J.  Moreover, Cabrera's

counsel admits that the staff union did not pursue arbitration, based on the following statements

Plaintiffs' counsel submitted to the NLRB:

- That he informed Local 1107 at the Step 2 meeting "that undersigned counsel would
  pursue the violations of the CBA in the Courts, rather than through arbitration, because
  the arbitration clause in the CBA does not appear to make arbitration mandatory, and the
  SEIU Trustees were already treating the grievance framework in the CBA as 'legally
  impossible to adhere to.'" *See* ENW Decl. ¶ 9 & Ex. H at 2–3;

- That "[t]he final reason that undersigned counsel filed the Cabrera action in the courts,
  rather than requesting arbitration, is the fact that the NSEUSU cannot afford to go to
  arbitration." *Id.* at 30;

- That requiring arbitration would be "problematic" because "undersigned counsel does not
  trust the FMCS [Federal Mediation and Conciliation Service] arbitration process." *Id.*;

- That "[u]ndersigned counsel does not intend to prosecute this matter, nor the other
  NSEUSU grievances, if they are forced to go to arbitration because there is no chance
  that undersigned counsel will be paid for his time and effort." *Id.* at 32.[8]

---

[7]  Although Plaintiffs dispute its fairness, there is no dispute that a Step 2 meeting occurred.

[8]  The position statement to the NLRB is authenticated by virtue of the fact that it was produced
by Plaintiffs in discovery. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 777 n. 20 (9th Cir.
2002); *Grow v. Garcia*, No. 0307-CV-00105-LRH-RAM, 2010 WL 455118, at *1 (D. Nev. Feb.
3, 2010) (citing *Orr*).

(c) NLRB award

On or about November 1, 2017, Javier Cabrera filed an unfair labor practice charge against Local 1107 with the NLRB.  *See* ECF No. 65-1 at 2.[9]  The charge was filed only against Local 1107; not SEIU.  *See id.*; *see also* ECF No. 47-5 (First Amended Charge filed by Cabrera).

Subsequently, the General Counsel of the NLRB issued a complaint against Local 1107 [ECF No. 47-17], and the matter was heard by an NLRB administrative law judge in February and March, 2019.  *See* ECF No. 65-1 at 2.  The respondent in the hearing was Local 1107.  *See id.*  The charging party, Cabrera, was represented in the hearing by his current counsel.  *See id.*  SEIU was not a party to these proceedings.  *See id.*

In an order that was not appealed, the NLRB administrative law judge found that Local 1107 had engaged in "certain unfair labor practices" under the National Labor Relations Act.  ECF No. 65-1 at 14.  As a remedy, the judge ordered that Local 1107 "*shall make Javier Cabrera whole in all respects*."  *Id.* (emphasis added).  This included an order of full reinstatement and all backpay (for loss of earnings and other benefits), with interest compounded daily, compensation for any adverse tax consequences of receiving a lump-sum backpay award, and compensation for Cabrera's search-for-work expenses regardless of whether those expenses exceeded interim earnings.  *See id.* at 14–15.

After the order, Cabrera was reinstated with Local 1107 on October 21, 2019.  Cabrera Depo, Tr. 67:5–7 ("Q. What's special about October 21st of 2019? A. That's when I got reinstated back to my job, not to my original position but to my job."); NSEUSU Depo, Tr. 104:10–12. Local 1107 is in the process of complying with the NLRB order making Cabrera whole.  NSEUSU Depo., Tr. 104:13–16. According to NSEUSU, which filed the grievance at issue in this case, the grievance and requested remedy have thus been fulfilled.  *Id.*[10]

---

[9]  Plaintiffs previously requested that the Court take judicial notice of this decision, ECF No. 65, and SEIU concurs for purposes of this motion to the extent relevant to determine the fact of the hearing, parties involved, and the remedy ordered in that decision.  *See* Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

[10]  Cabrera himself testified that when he was preparing for the Step 2 meeting with Blue, he considered a fair resolution of the grievance to be that Local 1107 "put me back to work with backpay and benefits reinstated . . . make right and whole, whatever that covers, back seniority, lost wages, same position, remove the writeup and stuff." Cabrera Depo, Tr. 47:16–21.

14

4.   NSEUSU's Eighth Claim under Section 301 and Related Grievances

The Eighth Claim, brought by NSEUSU under Section 301, alleges a number of breaches of the CBA and, as plead, alleges damages.  FAC, ¶¶ 174–184.

Paragraphs 176 and 177 allege that the trustees "[a]ttempted to force or otherwise coerce all NSEUSU employees to sign a new set of policies . . . that changed the terms and conditions of the CBA" and that this action breached Article 24 of the CBA.  However, NSEUSU did not file a grievance regarding this allegation. *See* NSEUSU Depo, Tr. 164:1 – 166:4.

Paragraph 178 alleges that the trustees breached "Article 8 Section 2 Clause 4 of the CBA by hiring a temporary employee to fill a vacant permanent front desk position covered by the CBA for the sole purpose of displacing a bargaining unit employee."  This claim concerns Miller, and as discussed above, no grievance alleges a violation of Article 8 of the CBA. NSEUSU Depo, Tr. 166:5 – 167:16; *see also* ENW Decl., Ex. G at 5 (NSEUSU's Response to Interrogatory Nos. 5 & 6, citing no additional grievances).

Paragraph 179 alleges that the trustees breached Article 11 of the CBA "by attempting to unilaterally alter the grievance procedure after imposition of the trusteeship," and paragraph 180 alleges the trustees also breached Article 11 "by refusing to follow the grievance procedure for the working conditions grievance filed by NSEUSU on February 7, 2017 [*sic*] for all NSEUSU employees, unilaterally determining the grievance did not qualify for the grievance procedure."[11]

It is undisputed that NSEUSU did not pursue the "working conditions" grievance through the grievance procedure.  On February 16, 2018, Local 1107 sent a letter stating it "intend[s] to meet with the Staff Union regarding the grievance at a Step 2 meeting" and suggested several meeting times the following week.  Blue Decl. ¶ 7 & Ex. L.  Local 1107 then scheduled a Step 2 meeting, but neither NSEUSU nor its counsel showed up.  *Id.*, ¶ 7.  Local 1107 thus considered the grievance abandoned and sent a letter to NSEUSU's president, and its counsel, notifying them of this fact.  *Id.* & Ex. M. NSEUSU's 30(b)(6) representative admitted the staff union has

---

[11]  The "working conditions grievance," filed by NSEUSU on February 8, *2018*, concerned whether organizers were given adequate time to prepare "three-week plans." *See* Blue Decl., Ex. K.  As a remedy, it sought "[t]hat staff is given ample time to complete assignments, and not expected to use their personal time to complete them. And that management ceases any harassment toward staff, and treats all staff members with dignity and respect." *Id.*

15

no information regarding whether Local 1107 was willing to hold a Step 2 meeting. NSEUSU Depo, Tr. 120:11– 121:12. Since the filing of the "working conditions" grievance, the trusteeship has ended, Local 1107 operates under elected leadership, and management has changed substantially. Fitzpatrick Decl. ¶ 12; NSEUSU Depo, Tr. 169:5–18.  NSEUSU's 30(b)(6) representative testified that currently, there are no active grievances between NSEUSU and Local 1107, meaning no grievances still pending and unresolved.  NSEUSU Depo, Tr. 137:1–25.

The grievance process has also changed since the trusteeship.  Currently, Step 1 grievances are heard by the Local 1107 president, Step 2 grievances go to an executive board panel, and Step 3 grievances can go to arbitration, as required by the CBA.  NSEUSU Depo, Tr. 143:4–20.  In the eyes of NSEUSU, the grievance steps are being followed.  *Id.* at 143:21–24.

In deposition testimony, NSEUSU's 30(b)(6) representative also clarified that although it is seeking remedies for individual members like Cabrera and Miller, it is not seeking any damages for NSEUSU itself.  NSEUSU Depo, Tr. 195:19–25 ("Q.  Are you guys seeking money from this litigation for the – you know, money back to the Staff Union? A. Not for us . . . ."); *id.* at 196: 11–14 ("Q. And so maybe for Debbie Miller, some[one] affected, but you're not seeking any money for -- itself, for the Staff union, correct?  A. Yeah. Yes.").

## III.    Argument

### A.    Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also* Local Rule 56-1. The burden initially lies on the moving party to show there is no genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986). The moving party, here Defendants, may show a lack of genuine issue by showing the non-moving party's evidence is insufficient to establish a material element of the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Where, as here, the non-moving party Plaintiffs bear the burden of proof at trial, the moving party need not disprove the non-moving party's case. *Id*.

In ruling on a motion for summary judgment, all justifiable inferences from the record are

to be drawn in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 617 (9th Cir. 1981). However, if the record could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

> **B.  Because SEIU Is Not an "Alter Ego" of Local 1107, It Is Not Liable for Any of Plaintiffs' Claims.**

Plaintiffs seek to hold SEIU liable both for Miller's federal and state discrimination claims and the assorted Section 301 claims. *See* FAC, ¶¶ 19–22 & ¶¶ 292–297.  However, the evidence is also undisputed that Cabrera and Miller were employed by Local 1107, not SEIU. Miller Depo, Tr. 214:5 – 215:14; Cabrera Depo, Tr. 108:10 – 112:25.

With respect to the Section 301 claims, because SEIU is not a party to the CBA with NSEUSU, under standard contract principles it is not liable under that contract. *See Loss v. Blankenship,* 673 F.2d 942, 946 (7th Cir.1982) ("[C]ourts construing the statute have held that § 301(a) does not provide the basis for an LMRA claim *against* a nonparty to the underlying collective bargaining agreement.") (emphasis in original); *Ramsey v. Signal Delivery Serv., Inc.*, 631 F.2d 1210, 1212 (5th Cir. 1980) ("§ 301 suits are confined to defendants who are signatories of the collective bargaining agreement under which they are brought.") (citing *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238 (1962)).[12]

Moreover, in a wrongful termination action filed by two former managers of Local 1107 who were terminated at the beginning of the trusteeship—and represented by the same counsel as Plaintiffs here—the Honorable Judge Gloria J. Sturman of the Eighth Judicial District Court of

---

[12]  The decision in *Burnick v. Office and Professional Employees International Union*, Case No. 14-C-1173, 2015 WL 1898310 (E.D. Wis. April 27, 2015), is also instructive. There, the plaintiff, a former employee of a local union, alleged that the local union promised to provide her with lifetime insurance benefits. *Id.* at *1. Thereafter, the international union placed the local union into trusteeship and appointed a trustee to manage the affairs of the local. *Id.* The plaintiff then sued both the local union and international union alleging both unions breached the agreement to provide her insurance benefits. *Id.* at *2. In dismissing the international union, the court emphasized that, like here, the obligation arose prior to the trusteeship, and there was no evidence the local union signed the insurance agreement on behalf of the international union. *See id.* at *3. The court also rejected the conclusion that by placing the local into trusteeship, the international union implicitly assumed obligations of the local union. *See id*. at *3–4.
*Burnick* directly supports summary judgment in favor of SEIU here. As in *Burnick*, SEIU did not employ Miller or Cabrera, and is not a party to the CBA, which was negotiated by Local 1107 representatives prior to the trusteeship.

Clark County, Nevada granted summary judgment in favor of SEIU because, *inter alia*, those

plaintiffs were not employed by SEIU and did not have an employment contract with SEIU. *See*

ENW Decl., Ex. E at 5. The same applies here.

    1. The ADA, Nevada law, and Section 301 apply the same "alter ego" and
      "single employer" tests to determine liability of allegedly related entities.

Instead of direct liability, Plaintiffs seek to hold SEIU liable on an alter-ego theory. *See*

FAC, ¶¶ 19–22 & ¶¶ 292–297. The Ninth Circuit applies the alter ego test to determine liability

of allegedly related entities under Section 301, and that includes a determination of whether the

two entities are "single employers." *See UA Local 343 of the United Ass'n of Journeymen &*

*Apprentices v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1470 (9th Cir. 1995) ("*Nor-Cal*") ("To

prevail on the 'alter ego' theory, appellees were required not only to make the threshold showing

that the two firms were a single employer, but also to prove that North Bay was being used in a

sham effort to avoid collective bargaining obligations, rather than for the pursuit of legitimate

business objectives untainted by union animus." (internal quotation marks and citations

omitted)). The "single employer" test is based on the degree of common ownership,

management, operations, and labor relations. *Id.*

   The Ninth Circuit applies the same four single-employer factors to determine whether

two employing entities "constitute a single employer for purposes of Title VII" and the ADA.[13]

*Herman v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 971*, 60 F.3d 1375,

1383 (9th Cir. 1995) ("The factors to be considered are: 1) inter-relation of operations; 2)

common management; 3) centralized control of labor relations; and 4) common ownership or

financial control."); *see also Childs v. Local 18, Int'l Bhd. of Elec. Workers*, 719 F.2d 1379, 1382

(9th Cir. 1983); *Ritzer v. Gerovicap Pharm. Corp.*, 162 F.R.D. 642, 645 (D. Nev. 1995).

However, the Ninth Circuit has recognized that "[i]n the absence of special circumstances, a

---

[13] The Ninth Circuit interprets the ADA and Title VII consistently, *see, e.g.*, *T.B. ex rel.
Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472–73 (9th Cir. 2015), and courts
apply the "single employer" test in the same way under both statutes. *See Rubino v. ACME Bldg.
Maint.*, No. C 08-00696 JW, 2008 WL 5245219, at *3 n.4 (N.D. Cal. Dec. 15, 2008) (quoting
*Swallows v. Barnes & Noble Book Store, Inc.,* 128 F.3d 990, 992 n. 2 (6th Cir. 1997) ("Because
Title VII, the ADEA, and the ADA define 'employer' essentially the same way, we rely on case
law developed under all three statutes.")).

1   parent corporation is not liable for the Title VII violations of its wholly owned subsidiary."

2   *Watson v. Gulf & W. Indus.*, 650 F.2d 990, 993 (9th Cir. 1981) (parent company not liable where

3   no evidence it "participated in or influenced the employment policies of" subsidiary).

4          The same "single employer" test applies to claims alleging unlawful employment

5   practices under Nevada Law.  *See Herman*, 60 F.3d at 1383–84 (applying same test to determine

6   whether another entity is an employer under NRS 613.310); *Fox v. Sysco Corp.*, No. 2:11-CV-

7   00424-RLH, 2011 WL 5838179, at *2 (D. Nev. Nov. 21, 2011) (applying same four-factor

8   "single employer" to determine whether an entity is liable under Title VII and NRS 613.330).

9                    2.       SEIU and Local 1107 are not "single employers."

10          "To survive summary judgment, plaintiff must establish a prima facie case for his

11   discrimination claims by submitting evidence that [two entities], though separate business

12   entities, constitute a single employer."  *Van Norman v. Harman Mgmt. Corp.*, No. C93-2880

13   MHP, 1995 WL 803508, at *3 (N.D. Cal. July 6, 1995).  In applying the single employer test, the

14   Ninth Circuit has emphasized that "[n]o one factor is controlling nor need all criteria be present,"

15   but "[t]he most important single factor is centralized control of labor relations." *Nor-Cal*, 48 F.3d

16   at 1470 (citing *J.M. Tanaka Constr. Inc. v. NLRB*, 675 F.2d 1029, 1033-34 (9th Cir. 1982)).

17          As the evidence makes clear, SEIU is not an alter ego of Local 1107, and the two are not

18   a single employer.  Rather, at all relevant times the two have been separate entities that were

19   separately managed and operated.  Fitzpatrick Decl. ¶¶ 2–4, 8, 11, 13; Blue Decl. ¶ 3.  Rather

20   than common ownership, Local 1107 has its own charter as a local union with its own funds and

21   treasury; this separate character was maintained throughout the trusteeship.  Fitzpatrick Decl.

22   ¶ 4; Blue Decl. ¶ 3.  And there is no material evidence that SEIU had centralized control over the

23   labor relations of Local 1107—the most important factor.  Rather, SEIU maintains its own

24   human resources department that conducts labor relations for SEIU employees only; at all times

25   Local 1107 management—whether operated by trustees or elected leaders—managed its own

26   labor relations with its employees and their staff union.  Fitzpatrick Decl. ¶ 13.  The most

27   relevant evidence of this is that the Local 1107 Trustees, Blue and Manteca, made all decisions

28   related to the claims in this lawsuit: Miller's accommodation request, Cabrera's termination, and

dealings with the staff union over grievances.  *See* Blue Decl. ¶¶ 4–7.  Plaintiffs did not go to SEIU with these issues, and SEIU was not involved in them.  *Id.*, ¶ 4; Fitzpatrick Decl. ¶ 14.

Based on the FAC, Plaintiffs' single employer/alter ego theory appears to be premised on a simple but erroneous syllogism: that because the trustees were appointed by SEIU, and the trustees thereafter took control of Local 1107's operations, SEIU controlled Local 1107.  However, a number of federal and state courts have rejected precisely this theory, finding that in the context of a Title VII allegation, a trusteed local does not become a single employer with the international union by virtue of a trusteeship.  For example, in *Campbell v. Int'l Bhd. of Teamsters*, 69 F. Supp. 2d 380, 385 (E.D.N.Y. 1999), the plaintiff alleged that centralized control of labor relations was shown because a trustee appointed by the international union made employment decisions for the local union.  Applying the single employer test discussed above, the court found such an appointment was not a basis for centralized control because "[a] trustee assumes the duties of the local union officer he replaces and is obligated to carry out the interests of the local union and *not the appointing entity*." *Id.* (emphasis added).

The *Campbell* court relied on the Ninth Circuit's decision in *Herman*, where the court rejected the argument that an international and local union were a single employer for purposes of establishing liability under the federal Age Discrimination in Employment Act or Nevada law, even though under the international union's constitution it "ha[d] the power to impose trusteeships over locals and control their affairs." 60 F.3d. at 1383. The court observed that such features "are common in union constitutions and do not sufficiently evidence the type of inter-relationship between the day-to-day operations of the International and the local union" required to establish single employer status. *Id.* Numerous courts have reached the same conclusion.  *See Dillard v. United Food & Commercial Workers Union Local 1657*, Case No. CV 11-J-0400-S, 2012 WL 12951189, at *9 (N.D. Ala. Feb. 9, 2012) ("As a matter of law, a trustee steps into the shoes of the local union's officers, assumes their rights and obligations, and acts on behalf of the local union."), *aff'd*, 487 F. App'x 508 (11th Cir. 2012); *Perez v. Int'l Bhd. of Teamsters, AFL-CIO*, Case No. 00-civ-1983-LAP-JCF, 2002 WL 31027580, at *5 (S.D.N.Y. Sep. 11, 2002); *Fields v. Teamsters Local Union No. 988*, 23 S.W.3d 517, 525 (Tx. Ct. App. 2000).

Because the Trustees here exercised discretion and acted in the interests of Local 1107, *see* Blue Decl. ¶ 3, and made all decisions related to the Miller accommodation request and the grievances underlying the Section 301 claims, there is no basis to find that SEIU and Local 1107 are a single employer. *See id.*, ¶¶ 5–7; Fitzpatrick Decl. ¶ 14.

Furthermore, Plaintiffs cannot establish the second factor of the alter-ego analysis applicable to their Section 301 claims. *See Nor-Cal*, 48 F.3d at 1470 (requiring that second entity is used "in a sham effort to avoid collective bargaining obligations" imposed on the union); *A. Dariano & Sons, Inc. v. Dist. Council of Painters No. 33*, 869 F.2d 514, 519 (9th Cir. 1989) ("In all alter ego determinations an element of fraud or misrepresentation also exists."). There is no evidence that SEIU's trusteeship over Local 1107 was "a sham effort to avoid collective bargaining obligations" with NSEUSU, or otherwise based on fraud or misrepresentation. *Nor-Cal*, 48 F.3d at 1470. Indeed, Judge Gordon rejected precisely such an allegation. *See Garcia*, 2019 WL 4279024, at *13 ("The plaintiffs have failed to demonstrate that Henry lacked a proper purpose in imposing the trusteeship or that she imposed it in bad faith.").

For these reasons, no proffered evidence supports a conclusion that SEIU and Local 1107 are alter egos or single employers, and thus SEIU cannot be liable for Local 1107's actions related to Miller's disability claims or staff union grievances.[14] For this reason alone, summary judgment should be granted in SEIU's favor on all claims.

**C.**     **First, Second, Third, Tenth, and Eleventh Claims: There is No Evidence Miller was Discriminated Against, Retaliated Against, Harassed, or Denied a Reasonable Accommodation on Account of Her Disability.**

Although SEIU was neither responsible for nor involved in Miller's accommodation

---

[14] To the extent Plaintiffs allege SEIU is liable for Local 1107 employment actions on an agency theory, the same principles apply. For example, in *Childs*, the court affirmed the dismissal of the plaintiff's Title VII claim against an international union where the "appellant has not alleged or offered to prove any of the traditional indicia of an agency relationship (such as consent by the alleged agent that another shall act on his behalf, and control of the alleged agent by the principal)." 719 F.2d 1382. Similarly here, there is no evidence the Trustees acted on SEIU's behalf in their decision-making regarding Miller, Cabrera, and NSEUSU. This is especially so because under federal law, "a trustee steps into the shoes of the local union's officers, assumes their rights and obligations, and *acts on behalf of the local union*." *Dillard*, *supra*, 2012 WL 12951189, at *9 (emphasis added). Plaintiffs' proposed agency theory would turn the well-established caselaw on its head, making a trustee the agent of the international union, rather than the agent of the local union. No case supports that misguided view of a trusteeship.

1    request, her deposition testimony makes clear she is not entitled to relief for her disability claims.

2              1.    Because there was no adverse action, Miller's harassment and retaliation
                     claims fail.

3              First, Miller's deposition testimony establishes that she cannot prevail on her retaliation

4    and harassment claims, both of which are premised on the claims that Miller was demoted and

5    her organizing territory changed after she requested an accommodation. *See* FAC, ¶¶ 68, 76, 77,

6    211. Rather, Miller was asked to drop off flyers on one day at two public sector employers

7    (LVCVA and RJC), was never told it was a permanent reassignment, and based on her concern

8    regarding the walking distance was not made to do either. *See* Miller Depo, Tr. 56–58; 62–63;

9    69:8–13; 71-72; 163:14-16. Nor was she ever told she was demoted, and there is no evidence her

10   salary or position changed.  Tr. 61:25 – 62:62:2; 221:19–24.  To the contrary, Local 1107's

11   October 26, 2017 letter granted her accommodations to continue in her organizing position, by

12   sitting and standing as she needed, taking breaks during her shift to manage her blood glucose

13   levels (by testing her levels, taking meal breaks, or breaks to take necessary medications), and

14   eating when necessary while working. Miller Depo, Ex. 9.

15             As such, Miller did not suffer an adverse action and cannot establish a prima facie case of

16   retaliation under the ADA or its Nevada counterpart, NRS 613.340.  *See Pardi v. Kaiser Found.*

17   *Hospitals*, 389 F.3d 840, 849 (9th Cir. 2004) ("To establish a prima facie case of retaliation

18   under the ADA, an employee must show that (1) he or she engaged in a protected activity; (2)

19   suffered an adverse employment action; and (3) there was a causal link between the two."). Nor

20   can Miller establish that she was harassed or suffered a hostile work environment in response to

21   her accommodation request.  *See Denning v. Washoe Cty.*, No. 3:17-cv-00463-MMD-WGC,

22   2018 WL 4286185, at *5 (D. Nev. Sept. 7, 2018) ("To sufficiently allege a claim for hostile work

23   environment a plaintiff must show that the workplace was permeated with discriminatory

24   intimidation that was sufficiently severe or pervasive to alter the conditions of her employment

25   and create an abusive working environment."), *aff'd*, 799 F. App'x 547 (9th Cir. 2020).

26             2.    Local 1107 granted Miller a reasonable accommodation, and properly
                     rejected the unreasonable accommodations she preferred.

27             This leaves Miller's claim that she was discriminated against, under the ADA and NRS

28   613.630, because Local 1107 did not grant her requested accommodations of a front desk job or

                                                     22

1   a set schedule.  *See* FAC, ¶¶ 49-51, 54, 195-96, 199.  To establish a prima facie case for failure to

2   accommodate, Miller must show "(1) [s]he is disabled within the meaning of the ADA; (2) [s]he

3   is a qualified individual able to perform the essential functions of the job with reasonable

4   accommodation; and (3) [s]he suffered an adverse employment action because of [her]

5   disability."  *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012).

6         However, Local 1107 granted Miller a reasonable accommodation: she was allowed to sit

7   and stand during her shift as needed, take breaks to manage her diabetes (for food, medication, or

8   glucose testing), and eat during her shift.  *See* Miller Depo, Ex. 11.  Miller also admitted she had

9   the ability to take food with her, bring glucose pills or an apple with her during work, and

10   discretion to sit and stand as needed.  Miller Depo, Tr. 97:13–20; 102:20 – 104:20; 137:4–5:  But

11   after October 30, she simply refused to try these accommodations, never returning to her position

12   after they were offered, and insisting instead on her favored accommodations of an occupied

13   desk position and set schedule.  However, an "employer is not obligated to provide an employee

14   the accommodation he requests or prefers, the employer need only provide some reasonable

15   accommodation."  *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002).

16   *See also U.S. E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1111 (9th Cir. 2010) ("EEOC

17   interpretive guidance states that 'the employer providing the accommodation has the ultimate

18   discretion to choose between effective accommodations, and may choose the less expensive

19   accommodation or the accommodation that is easier for it to provide.'") (quoting 29 C.F.R. Part

20   1630, App., 56 Fed. Reg. 35,726–01, 35,749 (July 26, 1991)).

21         In this respect, this case is nearly identical to *Schulman v. Wynn Las Vegas, LLC*, No.

22   212-cv-01494-RCJ-GWF, 2016 WL 199416 (D. Nev. Jan. 15, 2016), where the court granted

23   summary judgment to the hotel employer on a claim by the plaintiff, a night-shift security

24   officer, that he was denied a reasonable accommodation for his diabetes. After the security

25   officer had trouble managing his diabetes during the night shift, he applied for a day-shift

26   position, and was put on a waitlist.  *Id.* at *1.  His doctor thereafter wrote a note recommending a

27   day shift due to his diabetes.  *Id.*  Although this was his preferred accommodation, he remained

28   on the waitlist and was never transferred to the day shift.  *Id.*  Thereafter, the officer was

disciplined for falling asleep on the job a number of times, which he attributed to his blood sugar levels, and eventually Wynn told him he could not return as a security officer but could apply for other positions. *Id.* When he was subsequently placed in another position, also on the night shift, he continued to experience blood sugar irregularities and faced further discipline for falling asleep on the job. *Id.* He was subsequently moved to a retail position making less money. *Id.*

The court ruled that defendants "have satisfied their initial burden on summary judgment that they did not fail to make a reasonable accommodation under [42 U.S.C.] § 12112(b)(5)(A) when denying Plaintiff a day shift," specifically relying on the fact that "Plaintiff does not allege in the FAC that Defendants refused to permit him to have blood testing supplies, insulin, and food or glucose pills with him while he was working so that he could manage his blood sugar level." *Id.* at *5. Critically, the Court determined that the day shift option "was not the only way to reasonably accommodate Plaintiff's diabetes"; "[p]ermitting Plaintiff to manage his blood sugar with food, insulin, and testing supplies *cannot be said not to have been a reasonable accommodation, which need not be the employee's preferred accommodation.*" *Id.* (citing *UPS Supply Chain Sols.*, 620 F.3d at 1110–11) (emphasis added). The Court ruled this way even though the plaintiff's doctor had recommended moving him to the day shift, because the blood sugar management and sleepiness would be problems even during the day. *Id.*

Defendants are entitled to summary judgment here for the same reasons. Miller was provided the same accommodation in *Schulman*, and then some: not only was she "permit[ted] to have blood testing supplies, insulin, and food or glucose pills with [her] while [s]he was working so that [s]he could manage [her] blood sugar level," *see id.*, she was also permitted to take breaks from her work as needed. Local 1107 also granted Miller the accommodation of extended time off after her brief return on October 30, 2017, *see* Miller Depo, Tr. 140:15 – 141:6; but Miller continued to insist on the front desk and then quit in order to litigate this case.

Just as in *Schulman*, Local 1107 was not required to automatically grant the employee's preferred or doctor's recommended accommodation; it properly focused on Miller's impairments to determine the right accommodation. *McAlindin v. Cty. of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999) ("In the reasonable accommodation analysis, we focus on the impairment as relevant

24

to the workplace and thus on whether the employer is making reasonable accommodations."). The problem is that Miller never tried the accommodations provided. *See* Blue Decl., Ex. F at 2; Ex. G at 3–4. *Cf. Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 734 (5th Cir. 1999) ("It is difficult to judge the reasonableness of accommodations when the employee withdraws before we can say with any authority what these accommodations would have been.").

Moreover, as Manteca detailed in multiple communications, Miller's requested accommodations were not reasonable.  The front desk position was occupied by Nilda Mason, a temporary employee who started in June 2017 (four months before Miller's request) and was later hired on a full-time basis. ENW Decl., Ex. I (Deposition of Martin Manteca) ["Manteca Depo"], Tr. 189:22 – 190:2; 180:14–21.  It is well established that "the ADA does not require an employer to promote a disabled employee as an accommodation, nor must an employer reassign the employee to an occupied position . . . ." *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995); *see also Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 595 (7th Cir. 1999) ("[T]he ADA does not require an employer to bump an employee from an occupied position in order to accommodate a disabled employee."); 42 U.S.C. § 12112(b)(5)(A) (the term "reasonable accommodation may include . . . reassignment to a *vacant* position") (emphasis added).[15]

Finally, Miller's request for a "set schedule" was not a reasonable accommodation.  "The ADA does not require an employer to exempt an employee from performing essential functions" of their job.  *Dark v. Curry Cty.*, 451 F.3d 1078, 1089 (9th Cir. 2006) (concluding that county did not need to restructure plaintiff's position by exempting him from the essential duty of operating heavy machinery); *see also Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1583 (N.D. Ga. 1994) ("[A]n accommodation that eliminates an essential function of the job is not 'reasonable.'").  By its nature, the organizer position requires varied hours in a dynamic atmosphere.  Indeed, Local 1107's job description for the organizer position includes the following requirements: "Performing regular worksite visits including *varied hours of early*

---

[15]  Furthermore, Miller was not qualified for the front-desk position; when Manteca came in as Deputy Trustee in April, 2017, he introduced a requirement that the front-desk person be bilingual in either Spanish or Tagalog, in order to better serve the union's diverse membership. *See* Manteca Depo, Tr. 178:14–20; 179:9–16.

*morning, evenings and weekends . . . .*"; the ability to "prioritize and execute work subject to deadlines in a dynamic and changing environment, as an individual and as a member of a team"; "Ability to work in a fast-paced environment." *See* Miller Depo, Tr. 32–33 & Ex. 2 (emphasis added). As Miller testified, Local 1107 imposed "check-in" and "check-out" meetings for all organizers at the beginning and end of the day to go over assignments and the number of cards collected; the timing of the meetings was fluid and varied. *See* Miller Depo, Tr. 91:4–9; 92:2–3; 93:11–23. Providing her a set schedule apart from the rest would mean she would not be able to attend these meetings, which were essential parts of her job. *See Samper*, 675 F.3d at 1237 ("Attendance may be necessary for a variety of reasons. Sometimes, it is required simply because the employee must work as 'part of a team.'"); *cf. Hill v. Walker*, 737 F3d 1209, 1217 (8th Cir. 2013) ("The ability of individual caseworkers to pick and choose among case assignments based on their toleration of stress could wreak havoc with management of the agency.").

Multiple courts have rejected "set schedule" accommodations for employees with diabetes, where a varied or rotating shift schedule was a required part of the job, as here. *See, e.g., Rehrs v. Iams Co.*, 486 F.3d 353 (8th Cir. 2007) (rejecting accommodation claim of diabetic warehouse worker who sought a set "straight-shift" schedule where company had implemented rotating shifts); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 225 (5th Cir. 2011) ("None of the information Griffin provided UPS indicated that his requested accommodation [of a daytime schedule] was necessary for the management of his diabetes.").

### 3.   Miller was not a qualified individual with a disability.

Related to the above is an independent ground for granting summary judgment to Defendants: Miller cannot meet the second prong of a discrimination or reasonable accommodation claim of showing she is a "qualified individual" under the ADA. *Samper*, 675 F.3d at 1237. The ADA defines a "qualified individual" as an individual "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). Miller bears the burden of proving she is "qualified." *See Dark*, 451 F.3d at 1086.

It is apparent from her testimony that by October 2017, Miller was no longer able to

function as an organizer.  During her one-day return on October 30, she declined even dropping off flyers at RJC because the walk from the parking lot to the building was too long.  Miller Depo, Tr. 62:7–13; *see also id.* at Tr. 56:3–6 ("[A]s the years progressed, and it was more in 2017, if I had several [open table events at hospitals] to do in a day, it would have been a drastic effect going around from one place to the other, walking around."); Tr. 97:22–24 ("[T]he walking and the running around trying to meet with these potential employees to get COPE cards, it was just too much.").  Acknowledging her inability to perform the essential functions of the organizer job, Miller sought reassignment to an unavailable position.  Because Miller cannot meet her burden of establishing that she can perform the essential functions of her job with or without accommodation, her discrimination/accommodation claim fails as a matter of law. *See Dark*, 451 F.3d at 1086; *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007).

   **D.    Fifth Claim: Miller's Claims Regarding Her Request for an Accommodation Do Not Violate the CBA, and Plaintiffs Failed to Exhaust Their Claims.**

      1.    Miller cannot sustain a Section 301 lawsuit over grievances related to accommodation requests because the CBA excludes such claims.

   Plaintiffs' Fifth Claim alleges that Defendants violated Articles 1, 2, 8, 11, 22, and 24 of the CBA due to the denial of Miller's requested accommodation to be transferred to the front desk position.  *See* FAC at 18–21.[16]  The underlying grievance on which the claim is based explains that the aggrieved action was the denial of Miller's accommodation request, and the remedy sought was "[t]hat bargaining unit employee, Debbie Miller, receive the reasonable accommodation of being placed in the front desk position and that Mr Manteca adhere to the law of the Americans with Disabilities Act."  NSEUSU Depo, Ex. B.  However, because the CBA expressly excludes from the definition of a grievance matters subject to EEOC or Nevada Equal Rights Commission (NERC) jurisdiction, Miller's Section 301 claim fails as a matter of law.

   "Section 301(a) of the Labor Management Relations Act provides a federal remedy for breach of a collective bargaining agreement." *Alford v. Gen. Motors Corp.,* 926 F.2d 528, 530 (6th Cir. 1991).  Which grievances and Section 301 claims are actionable under a CBA, however, is limited by the terms of the agreement.  *See Vaca v. Sipes*, 386 U.S. 171, 184 (1967)

---

[16]  The claim regarding breach of Article 11, which is repeated in the Eighth Claim brought by NSEUSU, *see* FAC, ¶¶ 179–180, is addressed below in section G.

("Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced."). In cases interpreting an arbitrator's jurisdiction under a CBA, the Supreme Court has made clear that any contractual violation must rely on the terms of the CBA, not external law:

> As the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the 'industrial common law of the shop' and the various needs and desires of the parties. The arbitrator, however, *has no general authority to invoke public laws that conflict with the bargain between the parties*.

*Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 53 (1974) (emphasis added). *See also id.* at 56–57 ("Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the requirements of enacted legislation. Where the collective-bargaining agreement conflicts with Title VII, the arbitrator must follow the agreement.").

As such, Section 301 claims alleging discrimination are limited to the terms of the applicable CBA. For example, in *Carstarphen v. Kimberly-Clark Corp.*, No. CV 14-00162-CB-C, 2015 WL 5595764 (S.D. Ala. Sept. 21, 2015), the plaintiff alleged that he was unlawfully retaliated against for complaining about sexual harassment, in violation of the CBA's nondiscrimination clause. *Id.* at *7. Based on its review of the CBA provision, the court held that "[t]his provision clearly prohibits discrimination, but it neither explicitly nor implicitly prohibits retaliation," and thus concluded that "[s]ince retaliation is not covered by the nondiscrimination clause, Plaintiff's termination did not violate this provision of the CBA." *Id.*

Here, the parties were even clearer, expressing an affirmative intent to *exclude* particular claims from the grievance process, namely, ADA claims and state-law discrimination claims.[17]

---

[17] Even in the absence of such an express exclusion of particular types of claims founded on external law, unless a CBA clearly incorporates federal anti-discrimination law, arbitrators interpreting CBAs err on the side of non-inclusion. *See, e.g.*, *BWXT Pantex, LLC*, 120 Lab. Arb. 385 (Jennings, 2004) ("In certain situations, a collective bargaining agreement may not provide for the application of certain specific federal laws such as the ADA. In some cases in which the collective bargaining agreement is silent on the issue of ADA, arbitrators have refused to apply statutory law in rendering their decisions. Arbitrator Marvin Feldman ruled that arbitrators do not generally base their decisions on statutory provisions unless the contract directs the arbitrator to

Article 11 of the CBA states in part:

> A grievance shall not be defined to include any matter or action taken by the Employer or its representatives for which the Equal Employment Opportunity Commission (EEOC), or Nevada Equal Rights Commission (NERC), has jurisdiction or any matter specifically excluded from grievance and arbitration by other provisions of this Agreement.

Blue Decl., Ex. B at 15.  The arbitration provision of the CBA also states that "[t]he arbitrator, in the absence of expressed written agreement of the parties to this Agreement, *shall have no authority to rule on any dispute between the parties which is not within the definition of a grievance set forth in this article.*"  *Id.* at 17 (emphasis added).

It is clear that Miller's grievance concerns a matter for which the EEOC or NERC would have jurisdiction.  *See* NSEUSU Depo, Ex. B (requesting as remedy that Miller "receive the *reasonable accommodation* of being placed in the front desk position and that Mr. Manteca *adhere to the law of the Americans with Disability Act*") (emphases added).  In fact, Plaintiff Cabrera, who was previously the NSEUSU president, admitted that he was not aware of any fact, detail, or reason that would rescue Miss Miller's disability claim and his retaliation claim from this exclusionary CBA provision.  Cabrera Depo, Tr. 56:19 – 57:23.

Nor can the grievance be salvaged because it also claimed a violation of the CBA's non-discrimination clause.  That provision, Article 2, states:

> SEIU LOCAL 1107 and the Staff Union agree *that the provisions of this Agreement* shall be applied without discrimination on the basis of race, color, creed, sex, age, religious affirmation, sexual orientation, gender identity, gender expression, physical disability, national origin, ancestry, political beliefs or affiliations, membership in the Staff Union or participation in the activities of the Staff Union.

Blue Decl., Ex. B. at 4 (emphasis added).  The reason is simple.  Article 2 does not incorporate federal law; it merely ensures that *the provisions of the Agreement* not be "applied" in a discriminatory manner.[18]  The CBA does not address reasonable accommodations.  Therefore, on

---

do so. Other arbitrators state that the CBA reflects the intent of the parties and when the provisions of the ADA are not so included in an agreement, then a strong argument can be developed that the parties did not intend that such provisions to be so included in the agreement.") (footnotes omitted).

[18] As explained in one treatise on arbitration of collective bargaining disputes, there are three types of common non-discrimination clauses in CBAs: (1) those that "provide that the employer shall not discriminate in the application of the provisions of the [CBA] on any of the forbidden bases"; (2) those that provide the employer "shall not discriminate on any of the forbidden grounds involving wages, hours, or working conditions"; and (3) those that explicitly "incorporate into the agreement the provisions of the external law" on discrimination.  Marvin

its own terms, Article 2 was not violated.  Miller does not point to provisions of the CBA she

alleges were discriminatorily applied.  Instead, she argues that the obligation to provide a

reasonable accommodation, which is based on the ADA and not the contract, was violated.

Thus, there are no provisions of the CBA allegedly applied in a discriminatory manner,

and the grievance fails to state a violation of the CBA on its face.  *See Vaca*, 386 U.S. at 184

("Since the employee's claim is based upon breach of the collective bargaining agreement, he is

bound by terms of that agreement which govern the manner in which contractual rights may be

enforced.").[19]  Summary judgment should be granted on Miller's claim for this reason alone.

### 2.   Miller may not pursue claims for breach of the CBA that were not part of the grievance filed by NSEUSU.

"As a general rule in cases to which federal law applies, federal labor policy requires that

individual employees wishing to assert contract grievances must attempt use of the contract

grievance procedure agreed upon by employer and union as the mode of redress." *Republic Steel*

*Corp. v. Maddox*, 379 U.S. 650, 652 (1965). Based on this principle, "[i]t is axiomatic that an

aggrieved employee must exhaust any exclusive grievance and arbitration procedure created in a

collective bargaining agreement prior to bringing a . . . suit against the employer." *Stupy v. U.S.*

*Postal Serv.*, 951 F.2d 1079, 1082 (9th Cir. 1991) (citation omitted).

A preliminary step towards contractual exhaustion is filing a grievance over a claim.

Failure to do so is the basis for dismissing a Section 301 claim.  In *Moore v. Sunbeam Corp.*, 459

F.2d 811 (7th Cir. 1972), for example, the plaintiff's Section 301 claim was predicated on

several incidents for which grievances were filed, but in a deposition the plaintiff added an

additional incident related to an allegedly improper job transfer. *Id.* at 819.  The court easily

found a failure to exhaust as to the additional claim for which no grievance was filed, and

---

Hill, Jr. & Anthony V. Sinicropi, *Remedies in Arbitration*, at 90 (2d ed. 1991).  While the second
potentially requires application of external law and the third certainly does, the first type—seen
here— "adds nothing to the agreement but 'protective coloring,'" because differential application
of the provisions of an agreement would be a breach regardless.  *Id.*

[19]  In any event, the two provisions must be harmonized as a matter of contractual interpretation;
a claim that is expressly excluded cannot be overcome by general language. *See Baton Rouge Oil*
*& Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002) (holding, in
Section 301 case, "[i]t is a fundamental axiom of contract interpretation that specific provisions
control general provisions.") (citing  Restatement (Second) of Contracts § 203(c)); *Bechtel Corp.*
*v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1212 (3d Cir. 1976).

1    dismissed the claim for that reason.  *See id.* ("No grievance was filed as to the January 10

2    transfer; Moore clearly failed to exhaust contractual remedies on that issue.").

3        Courts interpreting Section 301 consistently require that a grievance on the alleged

4    Section 301 violation be filed prior to bringing suit.  *See, e.g. Winston v. Gen. Drivers,*

5    *Warehousemen & Helpers, Local Union No. 89*, 93 F.3d 251, 255 (6th Cir. 1996) (granting

6    judgment to defendants for failure to exhaust because "Plaintiffs never attempted to file a

7    grievance with their company or union, even though the union advised them to shortly after they

8    filed their lawsuit"); *Keister v. PPL Corp.*, 677 F. App'x 63, 67 (3d Cir. 2017) (affirming

9    dismissal of Section 301 claim); *Cole v. Gen. Motors Corp.*, 641 F. Supp. 28, 33 (W.D. Mich.

10   1984) (granting summary judgment dismissing Section 301 claim where plaintiff did not attempt

11   to file grievance).

12       For this reason, Plaintiffs cannot proceed under Section 301 for CBA breaches for which

13   they never filed a grievance.  The Miller grievance only alleged violation of Articles 1 and 2 of

14   the CBA.  NSEUSU Depo, Ex. B. The additional breaches alleged in this lawsuit—of Articles 8,

15   22, and 24—were not mentioned.  *Id.* That the grievance also states "and any other applicable

16   Articles and state and/or federal laws" does not save Miller's additional Section 301 claims from

17   the grievance-filing requirement; Article 11 of the CBA requires that "[t]he grievance shall state

18   the violation and cite the article and section." Blue Decl., Ex. B at 15. *See Vaca*, 386 U.S. at 184

19   ("Since the employee's claim is based upon breach of the [CBA], he is bound by terms of that

20   agreement which govern the manner in which contractual rights may be enforced.").

21       Therefore, because Plaintiffs NSEUSU and Miller did not file any grievances alleging

22   breaches of Articles 8, 22, and 24, and the grievances they did file do not mention those Articles,

23   Plaintiffs failed even to "attempt use of the contract grievance procedure agreed upon by

24   employer and union as the mode of redress," *Republic Steel*, 379 U.S. at 652, and Plaintiffs are

25   thus barred from relief as to such claims.[20]

26

27   _____

28   [20]  Even if Plaintiffs had not waived claimed breaches of Articles 8, 22, and 24, those claims
     would nevertheless fail. Article 8 is the "Management Rights" clause, and Section 2, paragraph 8
     states that Local 1107 has the "unilateral right[] . . .  to hire temporary employees, subcontract
     any of the work or services unless it is for the sole purpose of displacing bargaining unit

### 3.  Plaintiffs failed to advance Miller's grievance to arbitration.

Not only did Plaintiffs fail to file grievances over a number of alleged CBA violations they seek to adjudicate in this Court, but Plaintiffs failed to exhaust the grievance and arbitration procedure over the claims that *were* included in the Miller grievance.  First, when Local 1107 sought to reschedule the Step 2 meeting on the grievance, Miller's and NSEUSU's counsel refused the offer, describing the offer of a grievance meeting as an "attempt[] to drag out this issue" and rather than confirm their attendance, stated that "[w]e will be moving forward and initiating litigation in Ms. Miller's case."  *See* Blue Decl. ¶ 5 & Ex. D (responding to *id.*, Ex. C).

employees."  Blue Decl., Ex. B at 12.  Section 3 of Article 8 states that "[t]he reserved rights of SEIU Local 1107 shall not be subject to the grievance and arbitration provisions of this Agreement . . . ."  In other words, Local 1107 has the unilateral right to hire temporary employees, except in the one situation where such hiring "is for the sole purpose of displacing bargaining unit employees."  But the temporal sequence alone makes clear this was not the purpose of hiring a temporary employee to fill the front desk position when that person was hired—as the grievance states, "Debbie Miller has requested the front desk position *that is presently being occupied by a temporary agency employee*."  NSEUSU Depo, Ex. B (emphasis added).  This is undisputed.  *See* Miller Depo, Tr. 177:11–18.  As such, even if they had not waived the claim, Plaintiffs cannot prevail on their theory that Local 1107's refusal to fire an already-hired temporary worker in order to give her position to Miller violated Article 8 of the CBA, which gave Local 1107 the unilateral right to hire temporary employees.

Plaintiffs' claimed breach of Article 22 of the CBA, for requiring that the occupant of the front desk position speak Spanish [FAC, ¶ 108], also fails.  Article 22, entitled Bilingual Pay, states that "The President has the right to determine whether or not an employee meets the criteria that are necessary to receive Bilingual Pay and/or whether or not the employee's work duties necessitate a second language."  Blue Decl., Ex. B at 29.  It does not say that *only* the President has the right to determine this, and in any event, as NSEUSU's Rule 30(b)(6) representative admitted, the Trustee stands in the role of the President.  *See* NSEUSU Depo, Tr. 45:14–24.  Moreover, Art 22(c) also states that "The President's determination is final and *shall not be subject to the grievance and arbitration procedure*."  Blue Decl., Ex. B at 29 (emphasis added).  As such, it is clear the Trustee could require that an employee at the front desk—who fields calls from the union's diverse membership—speak a second language, and in any event Plaintiffs would have no right to pursue a grievance concerning that designation under the CBA.

Finally, Plaintiffs argue that the failure to grant Miller's requested accommodation, changing that position's requirements to include the ability to speak Spanish, and failing to "maintain the status quo under the CBA until the trusteeship ended" violated Article 24 of the CBA.  FAC, ¶ 109–110.  Article 24 states in relevant part that "[i]n the event of the transfer of control from SEIU Nevada Local 1107 to SEIU International, or in to any other entity . . . the Local hereby agrees that SEIU International . . . shall . . . provide for the retention of all employees covered under this Agreement as well as seniority and service credited of the employees *at the time of such change or transfer of control*."  Blue Decl., Ex. B at 31 (emphasis added).  Even assuming arguendo that this provision applies to the trusteeship and binds a non-party to the CBA like SEIU—both of which SEIU denies—the retention obligation only applies "at the time of such change or transfer of control"; it does not create an obligation to suspend all other provisions of the CBA, much less to guarantee sought-after accommodations upon request.  Miller *was* retained after the trusteeship, which occurred on April 28, 2017, and continued in Local 1107's employ until leaving that position in January, 2018.  As such, even if not waived, Plaintiffs' claimed breach of Article 24 would fail.

Local 1107 thereafter indicated that it intended to adhere to the CBA, *see id.*, Ex. F at 2 (bates-stamped Local 0314), and in light of Miller's refusal to meet with Local 1107 issued a detailed response based on the grievance as filed. *See id.* & Ex. E. Rather than request, at that point, to proceed to the next step in the grievance procedure—arbitration—on January 4, 2018, Miller's and NSEUSU's counsel wrote that, "[w]ith regards to Debbie Miller's matter, I reiterate that we will be proceeding to litigation." *See id.* & Ex. F at 2. Thereafter, Plaintiffs' counsel indicated that Miller would not be returning to work. *See id.* & Ex. G at 2–3.

In other words, despite the denial of her grievance at Step 2, Miller and NSEUSU did not attempt to exhaust the required CBA mechanism by proceeding to Step 3, arbitration. Instead, Miller and her counsel rushed to the courthouse. Because Miller and NSEUSU failed to exhaust the exclusive arbitration provision under the CBA, her Section 301 claims must be dismissed. *See Stupy*, 951 F.2d at 1082 ("It is axiomatic that an aggrieved employee must exhaust any exclusive grievance and arbitration procedure created in a collective bargaining agreement prior to bringing a . . . suit against the employer.").

**E.   The Seventh Claim: Because the NLRB Has Already Ordered Reinstatement and a Make-Whole Remedy, Cabrera's Claim Is Moot.**

The Seventh Claim alleges that Cabrera's termination violated the CBA between Local 1107 and NSEUSU, alleging violations of Articles 7 and 24. FAC, ¶¶ 164–166, 169. The grievance that forms the basis of his claim seeks, as a remedy, that he be "reinstated and made whole in every way." NSEUSU Depo, Ex. E.

Under Section 301, the applicable remedy for termination is generally reinstatement and a make-whole remedy, *i.e.* back pay. *See Local 2750, Lumber & Sawmill Workers Union, AFL-CIO v. Cole*, 663 F.2d 983, 985 (9th Cir. 1981) ("Reinstatement has long been regarded as an appropriate equitable remedy for wrongful discharge in section 301(a) suits in this and other circuits"); *Aguinaga v. United Food & Commercial Workers Int'l Union*, 58 F.3d 513, 519–20 (10th Cir. 1995) ("In hybrid § 301 cases, '[o]f paramount importance is the right of the employee, who has been injured by both the employer's and the union's breach, to be made whole.' Applying this general rule of awarding back pay and benefits until rejection of an offer of reinstatement is the only way Plaintiffs can be made whole . . . .") (*quoting Bowen v. United*

1    *States Postal Serv.*, 459 U.S. 212, 222, (1983)).[21]  This is the same remedy typically applicable

2    under the National Labor Relations Act.  *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197

3    (1941) ("Making the workers whole for losses suffered on account of an unfair labor practice is

4    part of the vindication of the public policy which the Board enforces.").

5            In this case, Cabrera has already achieved a full remedy through his NLRB proceeding.

6    Based on the binding order—for which no exceptions to the NLRB were sought—Cabrera is to

7    be reinstated and made whole "in all respects."  ECF No. 65-1 at 14.  Cabrera admitted he was

8    reinstated to his job, and previously indicated that the relief he sought was to be made whole.

9    Cabrera Depo, Tr. 67:5–7; *id.* at 47:14–21. Moreover, NSEUSU's Rule 30(b)(6) representative

10   confirmed that Local 1107 is in the process of complying with the NLRB's make-whole order.

11   NSEUSU Depo., Tr. 104:13–16.  *Critically, NSEUSU also agrees that the grievance and*

12   *requested remedy have been fulfilled.  Id.* at 104:17–21.[22]

13           For these reasons, Plaintiffs' claim regarding Cabrera's termination is moot and subject

14   to dismissal on this basis.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as*

15   *revised* (May 24, 2016) (holding that for Article III standing to bring a claim in federal court,

16   "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

17   conduct of the defendant, and (3) that *is likely to be redressed by a favorable judicial decision*.")

18   (emphasis added).  It is clear that if, while a case is pending, something happens that makes "it

19   impossible for the court to grant 'any effectual relief whatever'" with respect to a claim, the

20   claim becomes moot and must be dismissed.  *Church of Scientology of California v. United*

---

21   [21]  Reinstatement and backpay is also the standard remedy arbitrators award to remedy a
     termination in violation of just cause, according to the leading treatise on the subject.  *See*
22   Elkouri & Elkouri, *How Arbitration Works*, p. 18-15 (8th ed. 2016) ("Monetary damages in
     arbitration should 'normally correspond to specific monetary losses suffered;  one arbitrator
23   explained: 'The ordinary rule at common law and in the developing law of labor relations is that
     an award of damages should be limited to the amount necessary to make the injured whole.
24   Unless the agreement provides that some other rule should be followed, this rule must
     apply.'") (quoting *International Harvester Co.*, 15 Lab. Arb. 1,1 (Seward, 1950)).
25   [22]  Although it is not clear whether Cabrera seeks punitive damages, *see* FAC, ¶ 172 (indicating
     *Miller* seeks punitive damages), they would not be available for two reasons: they exceed the
26   remedy requested by the grievance, and they are generally not available in Section 301 cases.
     *See Desert Palace, Inc. v. Local Joint Exec. Bd. of Las Vegas*, 679 F.2d 789, 794 (9th Cir. 1982)
27   ("Generally, the remedy for breach of a collective bargaining agreement [under Section 301] is
     limited to an award of compensatory damages. Ordinarily, an award that exceeds the monetary
28   loss which an injured party suffered as a result of a contract breach is considered punitive.").

*States*, 506 U.S. 9, 12 (1992); *see also Spencer v. Kemna*, 523 U.S. 1, 18 (1998) (explaining that federal courts are "not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong."); *Bastani v. Am. Fed'n of Gov't Employees, AFL-CIO*, No. 1:18-CV-00063 (TNM), 2019 WL 5727961, at *4 (D.D.C. Nov. 5, 2019) (granting summary judgment to international union on Section 301 against it related to trusteeship on mootness grounds, because trusteeship had ended).

**F.      The Seventh Claim: Even if the Claim Were Not Moot, Cabrera's Failure to Exhaust His Contractual Remedies Bars Further Relief.**

Aside from the fact that Cabrera has already received a binding order granting him complete relief related to his discharge, his claim would fail because Plaintiffs failed to exhaust the grievance and arbitration process.  First, the "Article Violated" section of the Cabrera grievance states "Art 7: Discipline, and any other applicable Articles." NSEUSU Depo, Ex. E. For the same reasons discussed above, Cabrera cannot now pad his Section 301 claim with additional violations that were not alleged in his grievance.  As such, Plaintiffs' claim that Cabrera's discharge violated Article 24 of the CBA, FAC, ¶ 169, fails.[23]

Second, the evidence is clear that Plaintiffs did not exhaust the contractual grievance procedure by seeking arbitration of Cabrera's grievance. On January 29, 2018, after the Step 2 grievance meeting, Local 1107 issued a letter denying the grievance, and informing Cabrera and NSEUSU that "in accordance with Article 11, Step 3 of the Staff Union CBA, the Staff Union, on behalf of Mr. Cabrera, may make a written request for arbitration within five (5) working days of receipt of this Step 2 decision." Blue Decl. ¶ 6 & Ex. I. Plaintiffs did not advance the case to arbitration.  On March 5, 2018, Local 1107 counsel sent a letter to Cabrera's counsel informing him that NSEUSU missed the contractual timelines for submitting an arbitration panel request form to Local 1107. *Id.* & Ex. J. After this failure, NSEUSU did not take further steps to seek arbitration; to the contrary, as NSEUSU's counsel made clear to the NLRB, the staff union had no intention whatsoever of seeking arbitration. *See* ENW Decl., Ex. H at 2–3 (stating "that undersigned counsel would pursue the violations of the CBA in the Courts, rather than through

---

[23]  Even had such a claim not been waived, the proffered evidence does not show a violation of Article 24.  Like Miller, Cabrera was "retained" after the trusteeship in April, 2017, until his subsequent termination on October 30, 2017.  *See supra* n.20.

arbitration"); *id.* at 30 ("NSEUSU cannot afford to go to arbitration"); *id.* ("undersigned counsel does not trust the FMCS arbitration process."); *id.* at 32 ("Undersigned counsel does not intend to prosecute this matter, nor the other NSEUSU grievances, if they are forced to go to arbitration because there is no chance that undersigned counsel will be paid for his time and effort.").

Because Plaintiffs failed to exhaust the arbitration procedure without excuse, they may not bring a Section 301 suit on the claimed violation.  *Stupy*, 951 F. 2d at 1082 ("It is axiomatic that an aggrieved employee must exhaust any exclusive grievance and arbitration procedure created in a collective bargaining agreement prior to bringing a . . . suit against the employer.").

### G.     The Eighth Claim: NSEUSU's Grievance Claims Are Moot.

The Eighth Claim, brought by NSEUSU, alleges a medley of minor CBA violations. However, just as with the other Claims, for two of the claimed breaches, NSEUSU did not file any grievance alleging such violation. The NSEUSU 30(b)(6) representative admitted that NSEUSU did not file a grievance alleging the Trustees forced employees to sign new policies, in violation of Article 24 of the CBA.[24]  Similarly, NSEUSU did not file a grievance alleging that the hiring of a temporary employee in the front desk position violated the management rights clause of the CBA, Article 8.  *See supra* Section III.D.2 & n.20.  Plaintiffs may not pursue these "ungrieved" allegations in court.  *See Republic Steel Corp.*, 379 U.S. 650; *Stupy*, 951 F. 2d 1079.

The remaining allegations in the Eighth Claim are that Defendants breached Article 11 of the CBA when the Trustees (1) allegedly "attempt[ed] to unilaterally alter the grievance procedure" and (2) "refused to follow the grievance procedure for the working conditions grievance filed by NSEUSU on February 7, 2017 [*sic*][25] for all NSEUSU employees, unilaterally determining the grievance did not qualify for the grievance procedure." *See* FAC, ¶¶ 179–180.[26]

---

[24]  In any event, the claim that Local 1107 "changed the terms and conditions of the CBA without bargaining," FAC ¶ 176-77, does not allege a breach of any specific terms of the CBA, but is instead an unfair labor practice under the NLRA for failing to bargain in good faith. *See* 29 U.S.C. § 158(a)(5).  The NLRB would have exclusive jurisdiction over such a claim. *See San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959) ("When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board.").

[25] The "working conditions" grievance was actually filed February 7, *2018*. Blue Decl., Ex. K.

[26] As with the previous claims, there is no grievance actually claiming that Article 11 was

1    However, events during the pendency of this matter, including the end of SEIU's trusteeship

2    over Local 1107, have mooted both these claims.

3           NSEUSU's grievance claimed Manteca attempted to unilaterally alter the grievance

4    procedure for the Miller grievance by requiring that the Step 1 meeting be with himself and the

5    Step 2 meeting with Trustee Blue.  NSEUSU Depo, Ex. I.  As a remedy, NSEUSU requested that

6    "NSEUSU and SEIU Local 1107 obtain a list of all former EBoard members and through the

7    striking process, mutually agree upon a panel of 3 to 5 members" for a Step 2 meeting. *Id.*

8    Plaintiffs' allegation that Defendants violated Section 301 when the Trustees "attempt[ed] to

9    unilaterally alter the grievance procedure" [FAC, ¶ 179] is ostensibly related to this grievance.

10          However, fatal to the justiciability of this claim, in February and March of 2019, Local

11   1107's membership conducted an election of new officers, pursuant to which officers were

12   elected to the positions of President and to the Executive Board.  Fitzpatrick Decl. ¶ 12.  On

13   March 22, 2019, following the election and installation of new officers at Local 1107, SEIU

14   vacated its trusteeship and Local 1107 returned to self-governance.  *Id.*  As a result, for over a

15   year, Local 1107 elected officers, not any SEIU-appointed trustees, have been responsible for

16   processing NSEUSU's grievances and following the grievance procedure outlined in Article 11

17   of the CBA.  There is no dispute that Local 1107's elected officers have abided by Article 11 of

18   the CBA and the grievance process is working as intended.  Indeed, NSEUSU's Rule 30(b)(6)

19   representative, NSEUSU President Rosy Salinas, acknowledged that when NSEUSU files

20   grievances presently, NSEUSU is able to process these grievances through all the steps in Article

21   11.  NSEUSU Depo, Tr. 150:24 – 151:2; 152:2–9. *NSEUSU has also conceded that the remedy*

22   *requested in NSEUSU's November 28, 2017 grievance is no longer necessary*. *Id.* at 151: 3–7.

23          Consequently, it is now impossible for the Court to grant any effective relief for

24   Plaintiffs' claim that Defendants unilaterally altered the grievance procedure. Since there is no

25   dispute that the alleged attempt to alter the grievance procedure has ceased and Local 1107 is

26   now processing grievances in accordance with the CBA, neither declaratory nor injunctive relief

27

28   violated with respect to the "working conditions" grievance, as alleged in paragraph 180.  The
     grievance alleging violation of Article 11 concerns the processing of the October 29, 2017 Miller
     grievance, not the "working conditions" grievance.  *See* NSEUSU Depo, Ex. I.

from this Court will redress the alleged violation.  Thus, Plaintiffs' claim, even if once live,[27] is now clearly moot.  As such, the Eighth Claim should be dismissed in its entirety.[28]

**IV.    Conclusion**

For these reasons, SEIU respectfully requests that the Court grant summary judgment in its favor.

DATED:  July 22, 2020

ROTHNER, SEGALL & GREENSTONE
GLENN ROTHNER (*pro hac vice*)
JONATHAN COHEN
ELI NADURIS-WEISSMAN (*pro hac vice*)
CARLOS COYE (*pro hac vice*)

By  _____*/s/Eli Naduris-Weissman*_____
ELI NADURIS-WEISSMAN
510 South Marengo Avenue,
Pasadena, CA  91101-3115
Tel: (626) 796-7555 Fax: (626) 577-0124
*Attorneys for SEIU*

---

[27]  SEIU disputes that the grievance had merit at any point.  By operation of the voluntary trusteeship, the President and Executive Board members were removed, and the Trustees stood in their shoes.  *See* Fitzpatrick Decl. ¶¶ 10–11.  Indeed, NSEUSU's 30(b)(6) representative, President Salinas, admitted that the trustees had the authority to exercise the powers of the President or Executive Board members.  *See* NSEUSU Depo, Tr. 45:17–24.  The CBA states that the Step 2 appeal goes to the "Local 1107 Executive Board *as representative of the Employer*."  Blue Decl., Ex. B at 16 (emphasis added).  Because there was no Executive Board during the trusteeship, and under the agreed-upon grievance process between Local 1107 and NSEUSU, the Step 2 panel would be representing Local 1107 *as the employer*, Plaintiffs proposed remedy of empaneling 3-5 *former* Executive Board members who no longer represent Local 1107—and requesting that such members be designated through mutual agreement—makes no sense.  Rather, because the Trustees stood in the shoes of the President and Executive Board and could exercise their powers, the Trustees' proposed alteration accords with the CBA.

[28]  It is not clear that Plaintiffs seek any relief related to the "working conditions" grievance, which is mentioned in the FAC, *see* ¶ 180.  The evidence shows that, like the other grievances, Plaintiffs failed to exhaust contractual remedies by advancing this grievance to arbitration.  *See* Blue Decl. ¶ 7 & Ex. M. Relief would be barred on that basis.  In any event, for similar reasons as above, the "working conditions" grievance is moot.  The sole requested remedy in that grievance was for Local 1107 to provide its staff with sufficient time to draft their work plans and "treat all staff members with dignity and respect." Blue Decl. ¶ 7 & Ex. K.  With the end of the trusteeship and election of new leaders, management of Local 1107 has necessarily changed.  NSEUSU members are no longer required to draft three-week work plans, NSEUSU Depo, Tr. 172:17–24, and NSEUSU has conceded that this is no longer an issue between it and Local 1107.  *Id.* at 173:2–19. Indeed, at this time, according to NSEUSU, it has a good working relationship with Local 1107 and there are no new major issues between the parties. *Id.* at 163:4–17. Given that federal courts are "not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong," *Kemna*, 523 U.S. at 18, and Local 1107's management alone is responsible for staff assignments presently, neither a favorable declaratory nor injunctive order from the Court could provide Plaintiffs effectual relief at this point.

1

**<u>CERTIFICATE OF SERVICE</u>**

2         I am a member of Rothner, Segall & Greenstone.  On this 22nd day of July, 2020, I caused

3    a true and correct copy of the foregoing **DEFENDANT SERVICE EMPLOYEES**

4    **INTERNATIONAL UNION'S MOTION FOR SUMMARY JUDGMENT** to be served in

5    the following manner:

6    ✓    ELECTRONIC SERVICE:  Pursuant to LR IC 4-1 of the United States District Court for

7    the District of Nevada, the above-referenced document was electronically filed and served

8    through the Notice of Electronic Filing automatically generated by the Court.

9

10                        ROTHNER, SEGALL & GREENSTONE

11                        By   */s/ Eli Naduris-Weissman*

12                           ELI NADURIS-WEISSMAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28